**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GREGORY DUMANIAN, MD,       )
RANDA DUMANIAN, and       )
ADOM DUMANIAN,       )
       )
       Plaintiffs,       )       Case No. 19-cv-6771
       )
       v.       )       **JURY TRIAL DEMANDED**
       )
       )
MARK SCHWARTZ,       )
       )
       Defendant.       )

**COMPLAINT AND JURY DEMAND**

Plaintiffs Gregory Dumanian, MD, Randa Dumanian, and Adom Dumanian ("Plaintiffs") state the following Complaint against Defendant Mark Schwartz:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff Gregory Dumanian, MD, ("Dr. Dumanian") is a citizen of Illinois. He is the Chief of Plastic Surgery and Stuteville Professor of Surgery at Northwestern's Feinberg School of Medicine, and he was named Clinical Scientist of the Year for 2019 by the American Association of Plastic Surgeons.

2.      Plaintiff Randa Dumanian ("Mrs. Dumanian") is a citizen of Illinois. She is a trained Massachusetts Institute of Technology structural engineer, and she is married to Dr. Dumanian.

3.      Plaintiff Adom Dumanian ("A. Dumanian") is a citizen of Illinois. He is a graduate of Northwestern University Weinberg College of Arts and Sciences, and he is the son of Dr. and Mrs. Dumanian.

4.      Defendant Mark Schwartz is a citizen of Puerto Rico.  He is currently licensed to practice law in Colorado, and was previously a licensed attorney in Illinois, during which time he was formally reprimanded by the Illinois Attorney Registration and Disciplinary Commission.[1]

5.      This Court has personal jurisdiction over Defendant pursuant to the Illinois Constitution, the Constitution of the United States, and Illinois' long-arm statute, 735 ILCS 5/2-209, because Defendant purposefully directed his activities at Illinois and Plaintiffs' causes of action arise out of and relate to Defendant's contacts with Illinois.  This Court also has personal jurisdiction over Defendant because his affiliations with Illinois are so continuous and systematic as to render him essentially at home in Illinois.  Further, this Court's exercise of personal jurisdiction over Defendant comports with traditional notions of fair play and substantial justice.

6.      The Court has subject matter jurisdiction over this matter under 28 U.S.C § 1332(1)(a) because the amount in controversy exceeds $75,000 and this civil suit is between citizens of different states, and more specifically, a state and U.S. territory in this instance because Defendant is a citizen of Puerto Rico.

7.      Venue is proper in this Court under 28 U.S.C § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

**GENERAL ALLEGATIONS**

8.      Mesh Suture Inc. ("Mesh Suture" or the "Company") is a medical device company that was originally created and founded in Chicago, Illinois, and is now incorporated in Puerto Rico.  Mesh Suture is currently seeking FDA approval for a patented cutting-edge medical surgical technology called Duramesh Suturable Mesh ("Duramesh").  Duramesh will be only the third suture design ever created for the approximation of internal tissues, which include

---

[1] Defendant's Illinois ARDC Reprimand is attached hereto as Ex. 1.

but are not limited to, the abdominal wall, hernia repair, Achilles tendon, and rotator cuff surgery.

9.     Dr. Dumanian and Defendant have known each other since approximately 1998 when Defendant was living and working in Illinois, including, at one point, as an Illinois-licensed attorney.

10.     Mesh Suture was founded in Chicago, Illinois by Dr. Dumanian and Defendant in April 2012, at which point the Parties signed an original Founders' Agreement.

11.     Dr. Dumanian is a co-Founder, the Chairman of the Mesh Suture Board of Directors (the "Board"), a Director, and the Chief Medical Officer of Mesh Suture.

12.     Defendant is a co-Founder, the former-Chief Executive Officer ("CEO"), and a Director of Mesh Suture.

13.     Mrs. Dumanian currently serves as CEO, Chief Operating Officer ("COO"), and a Director of Mesh Suture.

14.     A. Dumanian is the Chief Marketing Officer, a Director, and Secretary of the Board of Mesh Suture.

15.     Mesh Suture was the brainchild of Dr. Dumanian.  He is the inventor of the technology at issue, and he is the scientific founder of the Company, which was created in 2012 and initially developed at a slow pace.

16.     When the Company was founded, Dr. Dumanian and Defendant lived in Chicago, Illinois.  Defendant was a longtime resident of the Chicagoland area up until four years ago when he moved fulltime to Puerto Rico.

17.     All of the documents related to the founding of the Company were developed and signed in Chicago, Illinois.

18.     On October 15, 2015, Dr. Dumanian and Defendant entered into an Amended and Restated Founders' Agreement (the "Founders' Agreement"). The Founders' Agreement was executed in Chicago, Illinois.

19.     Under the Founders' Agreement, the initial authorized share capital of Mesh Suture was 3,000 shares of Common Stock, and 1,500 shares of Preferred Stock. (Oct. 15, 2015, Founders' Agreement § 2, attached as Ex. 2.)

20.     Of the Preferred Stock, 500 shares were designated as Series F Preferred Stock and the remaining 1,000 shares were designated as Series A Preferred Stock. (*Id.*)

21.     Dr. Dumanian and Defendant each subscribed to 250 shares of Series F Preferred Stock for which they each paid $250,000. In addition, Dr. Dumanian subscribed to and paid for one share of Common Stock. (*Id.*)

22.     The Founders' Agreement also set forth the following requirements as to how the Board of Directors would be constituted:

> Each Founder agrees . . . to fix the number of Directors to be up to nine (9), but no less than two (2) and to elect and continue in office as Directors the following up to three (3) persons designated by Dr. Dumanian, for so long as Dr. Dumanian continues to hold Shares or Common Stock of the Company, one of whom shall initially be Dr. Dumanian, with the others to be designated at a later date; up to Two (2) persons designated by Dr. Schwartz, for so long as Dr. Schwartz continues to hold Shares or Common Stock of the Company, one of whom shall initially be Dr. Schwartz; one (1) person designated by the CEO; one (1) person who shall be designated by a majority of the holders of the Series A Preferred on or after the initial close of a Series A Preferred financing by the Company; and (2) persons who shall be designated by a majority of the Board.

(*Id.* at § 4.)

23.     In addition, the Bylaws of Mesh Suture, Inc. (the "Bylaws") provide legally binding insight as to how Mesh Suture's Board should be constituted, stating, among other

things, that "the holders of record of the shares Series F Preferred Stock . . . shall be entitled to designate up to five (5) directors of the Corporation. The CEO shall be entitled to designate up to one (1) director of the Corporation. For so long as at least twenty percent (20%) of the initially issued shares of Series A Preferred Stock remain outstanding, the holders of record of the shares Series A Preferred Stock, exclusively and as a separate class, shall be entitled to designate one (1) director of the Corporation (the 'Series A Preferred Director')." (Bylaws § 3.3, attached as Ex. 3.)

24.     The Founders Agreement stated that Dr. Dumanian is an employee of Mesh Suture and listed his responsibilities as, among other things, conducting and overseeing all of the Company's research, design, testing, and development work and serving as Mesh Suture's Chairman of the Board and Chief Medical and Technology Officer in accordance with an employment agreement attached to the Founders' Agreement. (Founders' Agreement § 5.)

25.     With respect to Defendant, the Founders' Agreement stated that he would serve as the CEO of the Company and as a member of the Board in accordance with an employment agreement, dated as of January 1, 2015, attached to the Founders' Agreement. (*Id*.)

26.     Defendant executed another Mesh Suture employment agreement as of January 1, 2019, (the "Employment Agreement"), in which he agreed to report to Dr. Dumanian, as the Chairman of the Board. (Jan. 1, 2019, Employment Agreement at 1, attached as Ex. 4.)

27.     Dr. Dumanian was in Chicago, Illinois when he issued the Employment Agreement to Defendant for Defendant to sign. Defendant signed the Employment Agreement on February 18, 2019, and then transmitted it back to Dr. Dumanian in Chicago.

28.     The Employment Agreement also provided for a five-year term of employment, "subject to earlier termination," as provided for in the Employment Agreement, and a base salary of $340,000, plus bonus eligibility, stock options, and other benefits.  (*Id*. §§ 1(d), (2).)

29.     The "Early Termination" provision of the Employment Agreement expressly provides that "Either Party or Gregory Dumanian shall have the right to terminate this Agreement with or without cause on 90 days' written notice to the other Party at any time."  (*Id*. § (6)(a).)

30.     Mesh Suture conducted Series A-1 and Series A-2 financing rounds in March 2018 and March 2019, respectively, which resulted in approximately 48 investors (the "Series A Investors") investing a total of almost $10.4 million in Mesh Suture.

31.     In addition, pursuant to Section 3 of the Founders' Agreement, Dr. Dumanian and Defendant subscribed to the Series A-2 Preferred round of financing in the amount of $360,000 each.

32.     At all times, Defendant had complete control over Mesh Suture's funds.  When Defendant set up the Company's bank account at Wells Fargo in approximately late 2014, Defendant made himself the sole signatory and failed to include Dr. Dumanian as a co-signatory on the business account.  This was done without Dr. Dumanian's knowledge or consent.

33.     Since the Series A money was raised, Defendant has overseen and orchestrated the expenditure of approximately $6.4 million.  Defendant was paying necessary invoices of Mesh Suture and paying the Company's payroll, but on information and belief, he was also using Mesh Suture funds for his own personal day-to-day expenditures.

34.     During 2019, Mesh Suture was working hard to gain Food and Drug Administration Approval for its mesh products to take Dr. Dumanian's invention to the

marketplace. During this time, it was especially important that Mesh Suture's funds were protected, and that Defendant operated with the utmost level of fiduciary responsibility to Mesh Suture and its investors.

35. Prior to joining Mesh Suture as an employee and an investor, Defendant had a tax lien business that was examined and critiqued by the Washington Post.[2] According to the Washington Post article, Defendant conducted his tax lien business by using mail drop locations in the Willis Tower in downtown Chicago.

36. At some point, Defendant closed his tax lien foreclosure businesses, and then, during the summer of 2019, he began to have cash flow problems.

37. According to the Washington Post article, Defendant's "estranged wife described a high-end lifestyle that took him to Hong Kong, London, Aruba and Hawaii. His Colorado estate has five bedrooms, a chef's kitchen, a game room and an artist's study." It is this high-end lifestyle that put Defendant in personal financial trouble, and led, in part, to the unlawful activity that is the subject of this lawsuit. This high-end lifestyle also included a spacious home in the exclusive Ritz Carlton Dorado Beach East Community in Puerto Rico. The home was partially torn down for a "gut-rehab" construction of the primary residence, a swimming pool, and a detached "casita."

38. On August 19, 2019, the Mesh Suture Board, which at that time consisted of Dr. Dumanian and Defendant as Directors, met in Dorado, Puerto Rico, to discuss many agenda items, including whether to appoint additional Board members (the "August Board Meeting").

39. It was resolved at the August Board Meeting that the Board would be expanded, and include the following directors: all three Plaintiffs, Defendant, and Leo Schwartz (Chief

---

[2] *See* https://www.washingtonpost.com/sf/investigative/2013/12/08/debt-collecting-machine/?utm_term=.9d6a43d1ee65 (last visited October 11, 2019).

Technology officer).  The Board also voted to permit Christopher Molina (Chief of Quality and Regulatory Affairs) to attend Board meetings as an observer with participation, but not voting, rights.

40.     It was also resolved at the August 2019 Board Meeting that the Board was ratifying the opening of Mesh Suture bank accounts at Wells Fargo, HSBC, and Banesco, which had occurred years earlier.

41.     In approximately December 2014, while in Edwards, Colorado, Defendant opened a Wells Fargo bank account, ending in 8414, (the "Wells Fargo Account") in Mesh Suture's name.  Since the Wells Fargo Account was opened more than four years ago, Defendant has had sole signing authority and access to the Wells Fargo Account.

42.     The funds in the Wells Fargo Account are entirely comprised of the funds raised from the Series A Investors during the two Series A financing rounds for Mesh Suture that occurred in March of 2018 and 2019.  Defendant does not have a personal right to any of the funds in the Wells Fargo Account, and yet, on information and belief, for years he has used Mesh Suture funds for his own personal use.

43.     On the night before the August Board Meeting, a discussion of Defendant's liquidity ensued between Defendant, Mrs. Dumanian, and Dr. Dumanian.  Dr. Dumanian favored refunding the $360,000 investment in the Series A-2 round of Mesh Suture to Defendant, essentially buying back his shares and thus assisting Defendant with his personal cash flow concerns.  Defendant, on the other hand, wanted a loan of approximately $324,000 from Mesh Suture.

44.     Dr. Dumanian insisted on independent corporate counsel to evaluate options and present to the board a plan to potentially assist Defendant, but because independent corporate

counsel was never involved, Dr. Dumanian did not approve any transaction involving Defendant's Series A investment.

45.     Defendant was upset that the Board had resolved to buy back his shares in lieu of a loan of approximately $324,000, and he retaliated against Plaintiffs by verbally abusing Dr. Dumanian on a phone call that occurred on August 22, 2019, and by blocking Plaintiffs' access to Company email and other Company information such as vital science and regulatory databases.

46.     In an email on August 23, 2019, Defendant again requested the Company loan him money instead of following through with the share buyback that was discussed by the Board on August 19th.  In response, Dr. Dumanian asked Defendant not to take any action on his loan proposal.

47.     The Mesh Suture Wells Fargo Account bank statements show that on August 23, 2019, Defendant impermissibly transferred $324,000 from the Wells Fargo Account to "Schwartz M Everyday Checking XXXXXX2231."

48.     Defendant likely did not disclose to the Series A Investors that he had misappropriated $324,000 from Mesh Suture's account.

49.     Defendant did not disclose to Dr. Dumanian that he had misappropriated $324,000 from Mesh Suture's account.  No documentation of the purported terms of this transfer has been provided to any Company official.

50.     As of late August 2019, Dr. Dumanian had personal knowledge that the Wells Fargo Account had about $4 million in it.

51.     On August 29, 2019, Defendant emailed Dr. Dumanian with a proposal to reduce the maximum number of Board seats from nine to five, with two to be appointed by Dr. Dumanian, two to be appointed by Defendant, and one to be appointed by the Series A Investors.

52.     Less than 24-hours later, on August 30, 2019, and without any authority to do so, Defendant took so-called "emergency action" to nominate and appoint himself as "Interim Series A Board Member."

53.     The next day, August 31, 2019, pursuant to Section 6 of the Employment Agreement, Dr. Dumanian notified Defendant in writing that his employment as CEO of Mesh Suture was terminated as of that date and gave Defendant 48-hours' notice of an emergency Board meeting to appoint a new CEO.

54.     On September 1, 2019, Mrs. Dumanian, as COO and acting CEO, advised Wells Fargo, via letter, that Defendant no longer had authorization to act on behalf of the Company because his employment had been terminated and Mrs. Dumanian requested that Wells Fargo immediately suspend Defendant's access to the Wells Fargo Account.

55.     On September 2, 2019, Defendant, via an email to Dr. Dumanian and all the Series A investors, purported to terminate all three Plaintiffs' employment effective immediately, which Defendant had no authority to do, especially in light of his termination as CEO two days before.

56.     In the same email, on September 2, 2019, Defendant advised that Plaintiffs' corporate email accounts had been suspended, and Defendant reiterated his suggestion that the number of Board seats be reduced to five.

57.     At the September 2, 2019, emergency Board meeting, which Plaintiffs attended by phone, Mesh Suture issued a number of corporate resolutions in light of Defendant's

termination as CEO, including naming Mrs. Dumanian as CEO. Despite receiving notice of the Board meeting, Defendant did not attend.

58.     Given the events of the preceding several days and in light of Defendant's sole control of the Well Fargo Account, on September 3, 2019, Dr. Dumanian went in to a Wells Fargo Branch located in Evanston, Illinois, and explained to a Wells Fargo banker the dire need to ensure that Defendant had not absconded with Mesh Suture's Series A Investors' money.

59.     Dr. Dumanian presented the Wells Fargo banker with the Founders' Agreement and his driver's license to demonstrate that he had a right to determine the account balance of the Mesh Suture account. The banker, after noting that Dr. Dumanian's name was on the Founders' Agreement, stated it was unusual for the bank to have opened the account with a single signatory considering that the bank possessed in the Wells Fargo banking history for the account the Founders Agreement showing that there were two founders of Mesh Suture.

60.     The Wells Fargo banker listened to Dr. Dumanian, and at approximately 10:30 a.m., reassured Dr. Dumanian that the account's balance had not changed recently.

61.     Dr. Dumanian also presented the corporate resolutions regarding Defendant's dismissal as CEO. While the branch bank discussed with lawyers in an outside corporate Wells Fargo office the possibility of freezing the bank account, at approximately 11:30 a.m., the same Wells Fargo banker appeared surprised, and told Dr. Dumanian that all of the money had been transferred out of the Mesh Suture Wells Fargo Account.

62.     In other words, three days after Defendant's termination as CEO of Mesh Suture, nearly $4,000,000 of the Company's money disappeared from a bank account over which Defendant had sole control and signing authority. Defendant stole the Company's money.

63. After learning the Wells Fargo Account had been completely drained by Defendant, Dr. Dumanian and Defendant had a telephone conversation, in which Defendant admitted to Dr. Dumanian, "I [Defendant] have your money," and told Dr. Dumanian that taking Mesh Suture's money was "Plan B," in response to (i) Dr. Dumanian's decision to terminate Defendant's employment as CEO; (ii) Dr. Dumanian's refusal agree to Defendant's demands to reconfigure the Board; (iii) Dr. Dumanian's refusal to provide a Company loan for over $300,000; and (iv) as part of Defendant's unlawful attempt to gain control of the Company.

64. The knowledge that millions of dollars of Company funds were being held hostage by Defendant in some unknown location, possibly outside the United States, and the resulting fear for Mesh Suture's future, compelled Dr. Dumanian and the other two Plaintiffs to consent under extreme duress to two agreements that accomplish Defendant's illegal goal of purporting to take over Mesh Suture. Defendant told Dr. Dumanian that Defendant would "undo Plan B" if Dr. Dumanian agreed to Defendant's demands.

65. The first agreement that was signed under extreme duress was the result of a "Special Emergency Meeting of Directors," on September 5, 2019, that occurred via electronic communication between Dr. Dumanian, in Chicago, and Defendant (who, on information and belief, was also in the Chicagoland area). Defendant was aware that Dr. Dumanian was in Chicago when the events of September 5, 2019, occurred.

66. During the purported "Special Emergency Meeting of Directors" on September 5, 2019, Dr. Dumanian was forced under extreme duress from Defendant to agree to a number of resolutions (the "Invalid Board Resolutions"), including to unlawfully rename Defendant as CEO, to name him Chairman of the Board, and to reduce the number of directors from nine down to five. (Sept. 5, 2019, Invalid Bd. Resolutions §§ 2–3, attached as Ex. 5.)

67.     Dr. Dumanian was further unlawfully compelled to agree that the Company's governing documents would be purportedly amended as follows:

> Mark Schwartz, a holder of record of shares Series F Preferred Stock, exclusively and as a separate class, shall be entitled to designate up to two (2) directors of the Corporation (the "Series F Preferred Directors"), one of whom shall be Mark Schwartz, as a Founding Shareholder.  Such designation powers are personal to Mark Schwartz and shall terminate automatically in the event of his death or permanent disability.  The Board Chairman shall be entitled to designate up to one (1) additional director of the Corporation which shall initially be Gregory Dumanian, as a Founding Shareholder.  For so long as at least twenty percent (20%) of the initially issued shares of Series A Preferred Stock remain outstanding, the holders of record of the shares Series A Preferred Stock, exclusively and as a separate class, shall be entitled to designate one (1) director of the Corporation (the "Series A Preferred Director"). The CEO or one (1) person designated by the CEO shall also be a director. All designees other than the Founding Shareholders, CEO, or BOD Chairman shall be ratified by a majority vote of the board and shall be independent, qualified, with both industry and prior Corporate Board experience, preferably on behalf of a publicly traded Company.

(*Id*. at § 4.)

68.     In other words, by stealing Mesh Suture's Series A Investors' nearly $4,000,000 investment from the Wells Fargo Account, Defendant illegally extorted Dr. Dumanian's agreement to allow Defendant to purportedly overtake the Board by becoming its Chairman and controlling four out of five Director seats.

69.     Finally, Dr. Dumanian was unlawfully compelled to agree to execute a mutual settlement agreement to purportedly release any and all claims against "one another over all events since the Company's founding through the date of such agreement."  (*Id*. at § 5.)

70.     The second agreement Defendant extorted from Plaintiffs was the Mutual Settlement and Release Agreement (the "Invalid Settlement Agreement", attached as Ex. 6.) contemplated by the September 5, 2019, Board Resolutions, and which Plaintiffs signed while

present in Chicago. Defendant knew that Plaintiffs were in Chicago when he forced them to sign the Invalid Settlement Agreement.

71.     The Settlement Agreement is between the purported "Mesh Parties" and the "Dumanian Parties."

72.     In an effort to further bully and intimidate Dr. Dumanian, Defendant decided to name himself and his family as the "Mesh Parties," as though he had some special authority to act on behalf of the Company when he did not.

73.     Moreover, Defendant's defining of the "Mesh Parties" in the Settlement Agreement to provide the improper appearance of trying to align himself with the Company is erroneous because over 50% of the Mesh Suture shareholders are aligned with Plaintiffs' positions as expressed herein. Dr. Dumanian owns 42% of the Company, and the vast majority of the Series A Investors have sided, or will side, with Plaintiffs in this lawsuit. Defendant is simply a minority owner in the Company with no legal right to have any control of Mesh Suture.

74.     The "Mesh Parties" in the Invalid Settlement Agreement include Mesh Suture, its subsidiary Mesh Suture Inc (HK) Ltd., and their affiliate, Advanced Suture Corporation; Mesh Suture's Directors, Officers, Employees, Agents; Mesh Suture's counsel, Defendant Schwartz of Tax Lien Law Group, LLC and its affiliate, Sulion, LLC; and Defendant, Yajia Hu Schwartz (Defendant's wife), Lindsey Schwartz (Defendant's daughter), Camila Lozano (Defendant's son's girlfriend), and Leo Schwartz, individually.

75.     The "Dumanian Parties" include the three Plaintiffs.

76.     In the Invalid Settlement Agreement, Plaintiffs were compelled to agree to provide a written confirmation of Mrs. Dumanian's resignation as acting CEO and confirm that she had been removed as a signatory at Banesco Bank and HSBC Bank, among other things,

14

designed to ensure Defendant's unfettered control of Mesh Suture and the Company's money. The Defendant continued to harass and accuse Dr. Dumanian of a failure to comply fully with this Invalid Settlement Agreement for the two weeks after the signing.

77.     Prior to her purported termination, Mrs. Dumanian was being paid $340,000 per year by Mesh Suture, and thus that amount is in controversy in this lawsuit as well.

78.     On October 1, 2019, Plaintiffs again confirmed via Wells Fargo bank statements provided by Defendant that on September 3, 2019, $3,929,135.89 was transferred from the Wells Fargo Account (in eight separate transfers) to Sulion LLC—Defendant's firm—leaving the Mesh Suture Wells Fargo Account balance of $-105.00.  Defendant had stolen the Company's money to extort Plaintiffs and to force them, under extreme duress, to execute the Invalid Board Resolutions and the Invalid Settlement Agreement.

79.     The Wells Fargo bank statements also confirm that $3,929,135.89 was transferred back into the Wells Fargo Account (in eight separate transfers) on September 6th, 2019, from "Tax Lien Law Group LLP," with is also Defendant's firm.  The transfers back into the Mesh Suture account occurred after Defendant secured Plaintiffs' signatures and agreement, under duress, regarding the Invalid Board Resolutions and the Invalid Settlement Agreement.

80.     Defendant's refusal to abide by his August 31, 2019, termination pursuant to his Employment Agreement results in a dispute amounting to at least $340,000 per year, the value of his salary under his Employment Agreement.  Moreover, Defendant's refusal to accept termination from the CEO position, and his purported termination of Plaintiffs Mrs. Dumanian and A. Dumanian have threatened the entire Company's future, putting the $10 million of investors' money at risk of being completely lost.

81.     Defendant has ensured that Mrs. Dumanian and A. Dumanian no longer have Company email accounts and they no longer have access to the Company's files.  Therefore, they can no longer work on the ongoing Preclinical, Clinical, and Engineering trials required by the FDA, nor on the drafting of the Mesh Suture 510(k) that must be filed in the near future with the FDA.  Without FDA approval, Mesh Suture cannot market its product in the United States and the entire Company is at risk due solely and exclusively to Defendant's unlawful actions.

## FIRST CLAIM FOR RELIEF
### Rescission of Invalid Board Resolutions Based on Economic Duress (Illinois Law)

82.     Plaintiffs restate, re-allege, reaffirm, and incorporate all preceding paragraphs as if fully contained herein.

83.     In approximately December 2014, Defendant opened the Wells Fargo Account, ending in 8414, in Mesh Suture's name.  Defendant has always had sole signing authority and sole access to the Wells Fargo Account.

84.     The funds in the Wells Fargo Account are entirely comprised of the funds raised from the Series A Investors during the two rounds of Series A funding for Mesh Suture that occurred in March of 2018 and 2019.

85.     As of August 30, 2019, the balance in the Wells Fargo account was $3,929,135.89.

86.     On September 3, 2019, Defendant wrongfully and unlawfully transferred $3,929,135.89 from Mesh Suture's Wells Fargo Account to Sulion LLC—a company that Defendant controls that is unrelated to Mesh Suture—which resulted in the Mesh Suture Wells Fargo Account balance being depleted to -$105.00.

87.     On the same day, September 3, 2019, Dr. Dumanian learned that nearly $4,000,000 of the Series A Investors' investment had been taken from the Wells Fargo Account.

88.     In a telephone call between Dr. Dumanian and Defendant on September 3rd, Defendant admitted to Dr. Dumanian, "I have your money," and told him that taking Mesh Suture's money was "Plan B," in response to Dr. Dumanian's decision to terminate Defendant's employment as CEO and Dr. Dumanian's refusal to agree to Defendant's demands to reconfigure the Board. Dr. Dumanian was told that Defendant would "undo Plan B" if Dr. Dumanian agreed to Defendant's demands.

89.     Defendant's wrongful and unlawful act of stealing and holding hostage millions of dollars of Company funds caused Dr. Dumanian grave distress and fear for Mesh Suture's future, overcame Dr. Dumanian's free will, and induced him to agree to the Invalid Board Resolutions detailed in the minutes of the September 5, 2019, "Special Emergency Meeting of Directors."

90.     Defendant took undue and unjust advantage of Dr. Dumanian's distress to coerce him into agreeing to the Invalid Board Resolutions, which had the purported effect of giving Defendant total control of the Board and of Mesh Suture.

91.     Defendant exerted wrongful and unlawful pressure over Dr. Dumanian that far exceeded mere vexation, stress, or hard bargaining.  Rather, Defendant's conduct rose to the level of oppression and taking of undue advantage of Dr. Dumanian's weakness as a result of knowing Defendant had stolen all of Mesh Suture's funds on the eve of the critical FDA approval phase of Duramesh, a revolutionary medical device that Dr. Dumanian had invented.

92.     Defendant's wrongful and unlawful pressure caused Dr. Dumanian to lack the meeting of the minds element that is essential to the making of a contract.

93.     Dr. Dumanian had no other alternative than to authorize the Invalid Board Resolutions.

94.     Because Dr. Dumanian authorized the Invalid Board Resolutions under duress, the Invalid Board Resolutions should be rescinded, and the Parties should be returned to the status quo existing at the time the contract was made.

95.     It is feasible under the circumstances to restore the Parties' to their pre-contract (pre-Invalid Board Resolutions) conditions.

## SECOND CLAIM FOR RELIEF
**Rescission of Invalid Settlement Agreement Based on Economic Duress (Illinois Law)**

96.     Plaintiffs restate, re-allege, reaffirm, and incorporate all preceding paragraphs as if fully contained herein.

97.     In approximately December 2014, Defendant opened the Wells Fargo Account, ending in 8414, in Mesh Suture's name.  Defendant has always had sole signing authority and sole access to the Wells Fargo Account.

98.     The funds in the Wells Fargo Account are entirely comprised of the funds raised from the Series A Investors during the two rounds of Series A funding for Mesh Suture that occurred in March of 2018 and 2019.

99.     As of August 30, 2019, the balance in the Wells Fargo Account was $3,929,135.89.

100.     On September 3, 2019, Defendant wrongfully and unlawfully transferred $3,929,135.89 from Mesh Suture's Wells Fargo Account to Sulion LLC—a company that Defendant controls that is unrelated to Mesh Suture—which resulted in the Mesh Suture Wells Fargo Account balance being depleted to -$150.00.

101.     On the same day, September 3, 2019, Dr. Dumanian learned that nearly $4,000,000 of the Series A Investors' investment had been unlawfully taken from the Wells Fargo Account.

102.    In a telephone call between Dr. Dumanian and Defendant on September 3rd, Defendant admitted to Dr. Dumanian, "I have your money," and told him that taking Mesh Suture's money was "Plan B," in response to Dr. Dumanian's decision to terminate Defendant's employment as CEO and Dr. Dumanian's refusal to agree to Defendant's demands to reconfigure the Board.  Dr. Dumanian was told that Defendant would "undo Plan B" if Dr. Dumanian  agreed to Defendant's demands.

103.    Dr. Dumanian immediately made Mrs. Dumanian and A. Dumanian aware of Defendant's extortion threats and his wrongful and unlawful pressure outlined herein.

104.    Defendant's wrongful and unlawful act of stealing and holding hostage millions of dollars of Company funds caused Plaintiffs grave distress and fear for Mesh Suture's future, overcame Plaintiffs' free will, and induced them to agree to the Invalid Settlement Agreement.

105.    Defendant took undue and unjust advantage of Plaintiffs' distress to coerce them into signing the Settlement Agreement, which had the purported effect of ensuring Defendant's total control of Mesh Suture and forever insulating him, his family members, and the firms that he controls to which, and from which, he transferred nearly $4,000,000 of Mesh Suture capital from all legal action whatsoever.

106.    Defendant exerted wrongful and unlawful pressure over Plaintiffs that far exceeded mere vexation, stress, or hard bargaining.  Rather, Defendant's conduct rose to the level of oppression and taking of undue advantage of Plaintiffs' weaknesses as a result of knowing Defendant had stolen all Company funds on the eve of the critical FDA testing approval phase of a revolutionary new medical device invented by Dr. Dumanian.

107.    Defendant's wrongful and unlawful pressure caused Plaintiffs to lack the meeting of the minds element that is essential to the making of a contract.

108.     Plaintiffs had no other alternative than to enter into the Invalid Settlement Agreement.

109.     Because Plaintiffs entered into the Invalid Settlement Agreement under duress, the Settlement Agreement should be rescinded, and the Parties should be returned to the status quo existing at the time the contract was made.

110.     It is feasible under the circumstances to restore the Parties' to their pre-contract (pre-Invalid Settlement Agreement) conditions.

**THIRD CLAIM FOR RELIEF**
**Declaratory Judgment Under 28 U.S.C. § 2201(a) Regarding**
**Parties' Rights to Designate Directors (Illinois Law)**

111.     Plaintiffs restate, re-allege, reaffirm, and incorporate all preceding paragraphs as if fully contained herein.

112.     Under 28 U.S.C. § 2201(a), in a case of actual controversy, this Court may declare the rights and other legal relations of any interested party seeking a declaration, and any such declaration has the force and effect of a final judgment or decree.

113.     An "actual controversy" exists here between the Parties, who have adverse legal interests, and their dispute is definite, real, substantial, and amenable to specific relief through a conclusive decree from this Court.

114.     As detailed herein, there is a dispute between the Parties as to their respective rights to designate Directors to Mesh Suture's Board.  The Parties' dispute concerns whether Section 4 of the Founders' Agreement or Section 4 of the September 5, 2019, Invalid Board Resolutions is determinative of the Parties' rights with respect to appointing Directors to the Company's Board.

115.     In addition, Section 3.3 of the Mesh Suture Bylaws also provide legally binding insight as to how the Board of Mesh Suture should be constituted.  The Parties' dispute concerns

20

how the Bylaws should be interpreted in light of Defendant's unlawful extortion of Dr. Dumanian to create the Invalid Board Resolutions.

116. The Parties' dispute about the documents discussed herein related to the configuration of the Board is a dispute over the control of at least $4,000,000 (the amount in controversy) because that is the approximate amount of Mesh Suture's money in the Wells Fargo Account at the time of the filing of this lawsuit and Defendant has already shown his willingness to misappropriate those funds.

117. Accordingly, an actual and justiciable controversy exists between Plaintiffs and Defendant. Plaintiffs therefore seek a declaratory judgment regarding the Parties' respective rights with respect to Mesh Suture's Board of Directors. Plaintiffs also seek a declaratory judgment regarding the unenforceability of the September 5, 2019, Invalid Board Resolutions.

## FOURTH CLAIM FOR RELIEF
### Declaratory Judgment Under 28 U.S.C. § 2201(a) Regarding Defendant's Employment Agreement (Illinois Law)

118. Plaintiffs restate, re-allege, reaffirm, and incorporate all preceding paragraphs as if fully contained herein.

119. Under 28 U.S.C. § 2201(a), in a case of actual controversy, this Court may declare the rights and other legal relations of any interested party seeking a declaration, and any such declaration has the force and effect of a final judgment or decree.

120. An "actual controversy" exists here between the Parties, who have adverse legal interests, and their dispute is definite, real, substantial, and amenable to specific relief through a conclusive decree from this Court.

121. As detailed herein, there is a dispute between Parties as to the proper interpretation of the "Early Termination" provision in Section 6(a) of Defendant's Employment Agreement.

122.     On August 31, 2019, Dr. Dumanian provided written notice to Defendant that his employment as CEO had been terminated, yet Defendant refuses to accept termination of his Employment Agreement, even in light of the fact that Mrs. Dumanian has been appointed CEO of Mesh Suture.

123.     Accordingly, an actual and justiciable controversy exists between the Parties as to whether or not Defendant can maintain his $340,000 per year job pursuant to his Employment Agreement.  Plaintiffs therefore seek a declaratory judgment regarding the Parties' respective rights and obligations as it pertains to the "Early Termination" provision of the Employment Agreement.

124.     Finally, as detailed herein, there is a dispute between the Parties as to whether the September 10, 2019, Invalid Settlement Agreement, which, among other things, purports to require Mrs. Dumanian to resign as CEO, is enforceable or should be rescinded as being procured by economic duress.

125.     Accordingly, an actual and justiciable controversy exists between the Parties, and Plaintiffs therefore seek a declaratory judgment (i) that Defendant was properly terminated on August 31, 2019 as CEO under the Employment Agreement; and (ii) that the September 10, 2019, Invalid Settlement Agreement is unenforceable with respect to its purported attempt to remove Mrs. Dumanian as CEO of Mesh Suture.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment—Illinois Law**

126.     Plaintiffs restate, re-allege, reaffirm, and incorporate all preceding paragraphs as if fully contained herein.

127.     As detailed herein, Defendant has engaged in unlawful and improper conduct as defined by law, including duress and undue influence.

128.     Through his unlawful conduct, Defendant unjustly procured, and purports to have retained for himself, the benefit of four Board seats, and thus, purported control of Mesh Suture, and then he used that benefit to Plaintiffs' detriment by terminating their employment and shutting them out of the ongoing operations of the Company.

129.     The Board seats are extremely valuable in that they permit the holders of the Board seats to control approximately $4 million of Mesh Suture funds and the future of what could be a ground-breaking, revolutionary medical device company that is the brainchild of Dr. Dumanian.

130.     Defendant is not entitled to the Board seats that he claims he obtained from Plaintiffs through unlawful activity, extortion, wrongdoing, duress, and undue influence, and Defendant's retention of the benefit of the Board seats violates the fundamental principles of justice, equity, and good conscience.

131.     Plaintiffs have suffered and will continue to suffer irreparable harm and damage as a result of Defendant's unjust enrichment, and the entire existence of Mesh Suture and Dr. Dumanian's medical device invention are in jeopardy due to Defendant being unjustly enriched.

132.     Therefore, a constructive trust should be imposed to avoid the unjust enrichment that would result from Defendant being permitted to purport to retain possession of the Board seats to which he is not entitled and to which he has no legal right.

## PRAYER FOR RELIEF

Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

A.     Rescission of the September 5, 2019, Invalid Board Resolutions, returning the Parties to the status quo existing at the time the Resolutions were made, that is, when Plaintiffs

were Mesh Suture employees and Board members, Dr. Dumanian was Chairman of the Board, and Defendant had been rightfully terminated pursuant to the "Early Termination" provision in his Employment Agreement;

B.     Rescission of the September 10, 2019, Invalid Settlement Agreement; returning the Parties to the status quo existing at the time the Settlement Agreement was executed, that is, when Plaintiffs were Mesh Suture employees and Board members, Dr. Dumanian was Chairman of the Board, Mrs. Dumanian was CEO, and Defendant had been rightfully terminated pursuant to the "Early Termination" provision in his Employment Agreement;

C.     Declaratory Judgment in Plaintiffs' favor (i) regarding Plaintiffs' rights with respect to Mesh Suture's Board of Directors; (ii) regarding Dr. Dumanian's right to terminate Defendant as CEO of Mesh Suture under the "Early Termination" provision of the Employment Agreement; (iii) regarding the unenforceability of the September 5, 2019, Invalid Board Resolutions; and (iv) regarding the unenforceability of the September 10, 2019, Invalid Settlement Agreement;

D.     A Constructive Trust declaring Defendant to be in possession of wrongfully acquired property and ordering the wrongfully acquired Board Seats to be transferred back to Plaintiffs as beneficiaries of the constructive trust; and

E.     Such other relief, including attorney fees and costs, to the extent permitted by law, and as the Court deems necessary and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims and issues so triable as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated:  October 11, 2019

Respectfully Submitted

**DOWD BENNETT LLP**

By: */s/ Matthew E. Johnson*
Matthew E. Johnson, IL Bar No. 6286501
1775 Sherman Street, Suite 2010
Denver, CO 80203
303-353-4361 (Telephone)
mjohnson@dowdbennett.com


*Attorneys for Plaintiffs*