**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **GREGORY DUMANIAN,** | ) | |
| **RANDA DUMANIAN, and** | ) | |
| **ADOM DUMANIAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 19 C 6771** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **MARK SCHWARTZ, YAJIA** | ) | |
| **HU SCHWARTZ, LINDSEY** | ) | |
| **SCHWARTZ, LEO SCHWARTZ,** | ) | |
| **CAMILA LOZANO, TAX LIEN** | ) | |
| **LAW GROUP, LLC, and** | ) | |
| **SULION, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Once friends and business partners, Dr. Gregory Dumanian and Dr. Mark Schwartz now stand on opposite sides of a bitter corporate governance dispute involving Mesh Suture, Inc. ("Mesh Suture"), a company they formed to develop and market a surgical suture of Dumanian's invention. As Dumanian tells it, after Dumanian fired Schwartz as CEO of Mesh Suture, Schwartz expropriated nearly $4 million from the company account, blocked Dumanian and his family's access to company email and work platforms, and published inflammatory accusations about Dumanian and his family to Mesh Suture investors and stakeholders. Schwartz then capitalized on Dumanian's vulnerable position by coercing him to sign board minutes that gave Schwartz majority control of the company and a settlement agreement releasing all claims against Schwartz and his family in connection with the dispute.

Dumanian, his wife Randa Dumanian, and their son Adom Dumanian (collectively "the Dumanians" or "Plaintiffs") filed this lawsuit against Schwartz, his wife Yajia Hu Schwartz, his children, Lindsey and Leo Schwartz, Leo Schwartz's girlfriend Camila Lozano, and two business entities controlled by Schwartz (collectively "Defendants"). Plaintiffs seek rescission of the board minutes and the settlement agreement and a declaratory judgment that Dumanian validly terminated Schwartz as the CEO of Mesh Suture. Plaintiffs have moved for a preliminary injunction. For the reasons that follow, the Court grants Plaintiffs' motion.

## I.      Background

The Court sets forth its factual findings below. These findings are based solely on the evidence presented to the Court in connection with Plaintiffs' motion and the Court's assessment of the credibility of witnesses, who testified at the preliminary injunction hearing. Furthermore, in considering a motion for a preliminary injunction, the Court may consider evidence that may be inadmissible at trial, such as hearsay, to the extent that it finds that evidence reliable. *Dexia Credit Loc. v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010) (evidence that is inadmissible under the Federal Rules of Evidence may be considered at a preliminary injunction hearing); *S.E.C. v. Cherif*, 933 F.2d 403, 412 n.8 (7th Cir. 1991) ("[H]earsay can be considered in entering a preliminary injunction."). The Court has done so here.

## A.      Formation and Early Years of Mesh Suture

Dumanian has worked as a plastic surgeon at Northwestern Memorial Hospital in Chicago for over twenty-five years. Prelim. Inj. Hr'g Tr. at 7:6–8:15,

2

*Dumanian v. Schwartz*, No. 19 C 6771 (N.D. Ill. Mar. 16, 2022) ("Hr'g Tr."), ECF Nos. 209–211. Dumanian, who specializes in abdominal wall reconstruction and hernia repair, observed during his clinical practice that the sutures he used to repair surgical incisions frequently cut through tissues and created complications. *Id.* at 10:8–12. One day in 2008, Dumanian "flashed [an] idea" for how to solve that problem—a suture made of mesh that allows tissue to grow into the suture itself, making it more resistant to tearing and able to achieve a better hold. *Id.* at 11:8; *see id.* at 11:4–11, 12:3–8.

To commercially develop the "mesh suture" idea, Dumanian obtained a patent and formed a company to license the patent rights from Northwestern Hospital.[1] *See id.* at 11:15–17, 13:17–19. To help run the business, Dumanian contacted Schwartz, who had become his friend after Dumanian had performed Schwartz's abdominal wall surgery years earlier. *See id.* at 263:3–264:7.

Schwartz agreed to help with the business, and in 2012 the men formed Advanced Suture Inc., a Delaware corporation, to hold the license and develop the invention. *Id.* at 18:1–3, 270:1–9. In October 2015, they signed a Founders Agreement reincorporating Advanced Suture in Puerto Rico and, at the same time, forming Mesh Suture Inc., another Puerto Rico corporation. *Id.* at 18:9–14; *see generally* Pls.' Ex. 27, Am. Reinstated Founders' Agreement (Oct. 15, 2015) ("Founders' Agreement").

---

[1]    Because Dumanian had developed the mesh suture concept while working at Northwestern Hospital, it owned the patent rights. Hr'g Tr. at 11:15–17, 13:17–19.

The Founders' Agreement gave Dumanian and Schwartz each a roughly fifty percent stake in Mesh Suture, with each partner holding 250 shares of preferred stock, which they purchased at $1,000 per share. Founders' Agreement at 2. Dumanian insisted, however, that he have ultimate control of the company, so the agreement provided Dumanian with one $10 share of common stock, which would give him the "final say" over Schwartz. Hr'g Tr. at 19:7–17; Founders' Agreement at 2.

The Founders' Agreement also provided for a board of directors consisting of:

> up to three (3) persons designated by Dr. Dumanian, for so long as Dr. Dumanian continues to hold Shares or Common Stock of the Company, one of whom shall initially be Dr. Dumanian . . .
>
> up to [t]wo (2) persons designated by Dr. Schwartz, for so long as Dr. Schwartz continues to hold Shares or Common Stock of the Company, one of whom shall initially be Dr. Schwartz . . .
>
> one (1) person designated by the CEO;
>
> one (1) person who shall be designated by a majority of the holders of the Series A Preferred on or after the initial close of a Series A Preferred financing by the Company; and
>
> two (2) persons who shall be designated by a majority of the Board.

*Id.* Because Dumanian and Schwartz appointed Schwartz as the CEO, they each controlled three board seats at the time of incorporation, with three board seats to be filled later, after the initial ("Series A") round of outside investment. *Id.*; *see* Hr'g Tr. at 21:10–20.

4

Schwartz also signed an employment agreement with the company. The agreement gave Dumanian a personal right to terminate Schwartz as CEO "with or without cause on 90 days' written notice . . . at any time." Pls.' Ex. 7, Schwartz Employment Agreement ¶ 6(a); *see* Hr'g Tr. at 21:21–24. If Dumanian chose to exercise that right and appoint his own CEO, he would have control of four board seats to Schwartz's two. Hr'g Tr. at 21:21–24.

About two years after the founding of the company, Mesh Suture started to raise Series A funds. The first round of investments, which took place in late 2017 and early 2018, raised about $4 million from a wide array of investors, including Dumanian's family, the Armenian community in Chicago, Dumanian's colleagues at Northwestern, and plastic surgeons who had become familiar with the mesh suture concept from Dumanian's lectures and publications. *Id.* at 26:18–27:17.

A second round of Series A funding took place in late 2018 and early 2019, and raised about $6 million from the same group of investors. *Id.* at 28:15–20. Dumanian and Schwartz each invested an additional $324,000 during the Series A round, on top of their initial $250,000 investments. *Id.* at 29:7–19.

## B. Schwartz's Termination and Its Immediate Aftermath

By mid-2019, Dumanian and Schwartz started to clash. One source of conflict was Schwartz's numerous requests to take out a $324,000 loan from the company to help with his personal financial troubles. *See id.* at 32:2–36:3.

Things came to a head during the week of August 19, 2019. According to Dumanian, during that week the two men had numerous phone conversations in

which Schwartz "verbally abused[], threatened[], and insulted [him]" over his refusal to permit Schwartz to take the loan, among other issues. Pl.'s Ex. 4, Email from Dr. Gregory Dumanian to Mark Schwartz (Aug. 23, 2019, 9:35 PM). Eventually, Schwartz directed his son Leo to lock Dumanian, Randa Dumanian, and Adom Dumanian out of the company email accounts and quality management systems. Hr'g Tr. at 722:4–7. Leo Schwartz testified that his father told him that the Dumanians' access needed to be blocked because the Dumanians were "threatening company assets." *Id.* at 722:22–23. And, according to Mesh Suture's bank records, on that same day, Schwartz transferred $324,000 from the company account to his personal account. *See* Pls.' Ex. 6, Mesh Suture Wells Fargo Bank Statement, at 5. Dumanian credibly testified that he had no knowledge of the transfer before it occurred and did not approve it. Hr'g Tr. at 37:20–38:2.

Tensions remained high between the Dumanians and Schwartz throughout the following week, and on August 30, 2019, Schwartz sent another email to Dumanian in which he stated that he was taking "emergency action" to appoint himself "Interim Series A Board Member." Defs.' Ex. 19, Email from Mark Schwartz to Dr. Gregory Dumanian (Aug. 30, 2019, 4:00 PM) (alterations omitted). Dumanian testified that this email "was the straw that broke the camel's back" because Schwartz's actions "showed [Dumanian] that [Schwartz] was trying to take over the company." Hr'g Tr. at 56:7–13.

The following day, Dumanian sent Schwartz an email informing him that Dumanian was terminating Schwartz as the company's CEO. Pls.' Ex. 8, Email from

Dr. Gregory Dumanian to Mark Schwartz (Aug. 31, 2019, 8:56 PM). But Schwartz told Dumanian the next day that he had "absolutely no intention of stepping down as CEO" and that "[Dumanian's] Notice of Termination . . . is entirely without legal effect and hereby rejected, in toto." Pls.' Ex. 45, Email from Mark Schwartz to Dr. Gregory Dumanian (Sept. 1, 2019, 12:27 PM). Schwartz also threatened to sue the Dumanians and purported to fire *them* from Mesh Suture. *Id.*

A day later, Schwartz again locked the Dumanians out of their company emails and work platforms. Hr'g Tr. at 723:5–21. He also sent another email to a recipient group named "Team," which, according to Dumanian, included "anybody that ever had anything to do with Mesh Suture, including any of the surgeons [Schwartz] had met at meetings through me, the science advisory board . . . who were surgeons around the country and around the world who were my friends, [and] all of my family." *Id.* at 67:19–68:1. In that email, Schwartz characterized the Dumanians' actions as "a serious and dangerous threat from within our own family"; he claimed that Dumanian had attempted to fire him as CEO "in retaliation for refusing to subordinate company assets and shareholder interests to Greg and Randa Dumanian's own personal interests." Pls.' Ex. 9, Email from Mark Schwartz to Mesh Suture Investors, Partners, and Employees (Sept. 2, 2019, 6:23 PM). Schwartz also wrote that the Dumanians had engaged in numerous acts of misconduct, including extortion, lies to shareholders, and "threaten[ing] the safety of myself and my family with armed security."[2] Dumanian testified that he found the email "slanderous" and

---

[2]     This was a reference to an incident in which Schwartz's wife, Yajia, claimed she had been threatened with a gun when she attempted to access the Mesh Suture facility in Puerto

"bullying." *Id.* at 71:6–11. Randa Dumanian described it as "a cataclysm in my personal life and my family's life" and "the end of our world." *Id.* at 520:15–25.

Attached to the "Team" email were draft board minutes prepared by Schwartz that purported to ratify Schwartz's appointment of himself as Series A board member, remove Dumanian as a board member for cause, nullify Dumanian's appointment of Randa Dumanian and Adom Dumanian to the board, and reduce the number of board seats from nine to five. *See* Pls.' Ex. 10, Draft of September 2, 2019 Board Minutes, at 1–2. Schwartz asked Dumanian to sign them, but Dumanian refused. Hr'g Tr. at 75:25–76:4.

The next morning—September 3, 2019—Dumanian called the Wells Fargo branch where the Mesh Suture bank account had been opened in order to "secure" the account, *id.* at 77:14–17, because, according to his testimony, he "knew somehow that [Schwartz] was going to try and move the Mesh Suture money to put pressure on [him]." *Id.* at 77:18–21. A Wells Fargo employee later confirmed Dumanian's suspicions—all of Mesh Suture's money was gone from the account. *Id.* at 80:22–23.

Indeed, Schwartz testified—and a Wells Fargo bank statement shows—that, on September 3, 2019, Schwartz transferred $3,929,135 from the Mesh Suture Wells Fargo account to a "Sulion LLC" account, which he had used for an unrelated business venture in the past. *Id.* at 327:7–328:20; 333:3–16; Pls.' Ex. 46 at 9–10. According to Schwartz's testimony and the memos on the transfers, he did so to "safeguard" Mesh

---

Rico on the morning of September 2, 2019. Hr'g Tr. at 321:1–18.

Suture's funds because he "[didn't] know what [the Dumanians were] up to." Hr'g Tr. at 328:11–14, 329:8, 333:3–10.

After Dumanian learned that the money was missing from the account, he was "despondent" and attempted to cancel two minor surgical procedures he was scheduled to perform later that day. *Id.* at 92:7; *see id.* at 94:5–8. Sometime that morning, Randa Dumanian called her husband and asked about the status of the money. Dumanian replied: "It's all gone. He took it all. He took it all." *Id.* at 530:25–531:1. According to Randa Dumanian, her husband seemed "in shock" and spoke "in a very low register, slowly, [with] long silences." *Id.* at 531:3–4.

Later that day, Dumanian and Schwartz had a twenty-three-minute phone conversation in which they continued to trade blows. *See* Defs.' Ex. 40, Tr. Sept. 3, 2019 Telephone Meeting Between Gregory A. Dumanian and Mark A. Schwartz.[3] On the call, Schwartz repeatedly referenced "Plan B" and the "war" between the two camps. *See id.* at 2:4, 5:25, 8:4–5, 8:13–14, 10:16–18. But he made no reference to the money he had transferred out of the Wells Fargo account. *See generally id.*

---

[3]     Plaintiffs object to any references to the recording or transcript of the September 3 phone call because, in their view, the recording violated Illinois law—specifically, an anti-eavesdropping statute prohibiting the use of "an eavesdropping device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation." 720 Ill. Comp. Stat. 5/14-2(a)(2); *see id.* § 5/14-5 ("Any evidence obtained in violation of this Article is not admissible in any civil or criminal trial[.]"); Hr'g Tr. at 211:2–5, 212:16–20. The Court provisionally admitted the recording at the hearing, *see id.* at 214:6, and declines to revisit that ruling now because (1) the recording is sufficiently reliable and (2) the Court it is not convinced that the recording contains evidence favorable to Defendants. *See* discussion *infra* Part III.A.1. Accordingly, there is no prejudice to Plaintiffs from admitting the recording and transcript.

9

## C.     The Board Minutes and Settlement Agreement

Dumanian made several other phone calls to Schwartz on September 3 and September 4, and Schwartz sent Dumanian several drafts of proposed board minutes. Hr'g Tr. at 96:15–18; *see* Defs.' Exs. 48, 49, 50, 51. Eventually, on the morning of September 5, 2019, Schwartz sent Dumanian a final draft of proposed board minutes for a "special emergency meeting" that Schwartz had scheduled for 10:30 a.m. that day. *See* Pls.' Ex. 11, Draft Board Minutes, Special Emergency Meeting of Directors (Sept. 5, 2019) (the "Board Minutes"). Dumanian testified that he had received no notice of any board meeting that purportedly occurred at 10:30 that morning and did not actually attend one. Hr'g Tr. at 98:14–25.

Schwartz's proposed Board Minutes contained several resolutions. First, they included a resolution that split off the "Academic and Scientific Affairs" division from the company and provided that the division would operate "under the direction of [Dumanian]" and pursuant to "a separate consulting contract." Board Minutes ¶ 2. The Board Minutes also contained several resolutions amending the company bylaws. Among other things, these resolutions reduced the number of directors from nine to five, *see id.* ¶ 3, and provided for their appointment as follows:

> Mark Schwartz, a holder of record of shares Series F Preferred Stock, exclusively and as a separate class, shall be entitled to designate up to two (2) directors of the Corporation (the "Series F Preferred Directors"), one of whom shall be Mark Schwartz, as a Founding Shareholder. Such designation powers are personal to Mark Schwartz and shall terminate automatically in the event of his death or permanent disability. The Board Chairman shall be entitled to designate up to one (1) additional director of the Corporation which shall initially be Gregory Dumanian, as

10

> a Founding Shareholder. For so long as at least twenty
> percent (20%) of the initially issued shares of Series A
> Preferred Stock remain outstanding, the holders of record
> of the shares Series A Preferred Stock, exclusively and as
> a separate class, shall be entitled to designate one (1)
> director of the Corporation (the "Series A Preferred
> Director"). The CEO or one (1) person designated by the
> CEO shall also be a director.

*Id.* at ¶ 4. This proposal gave Schwartz personal control of four of the five seats on the new board—the two "Series F Preferred Directors"; the Board Chairman seat (initially to be filled by Dumanian, but subject to Schwartz's replacement); and the CEO seat. *See id.*; Hr'g Tr. at 99:19–100:2, 369:1–4.

Dumanian received the proposed Board Minutes on the morning of September 5. *See* Hr'g Tr. at 100:14–19. The parties' accounts of the negotiation process that led to Dumanian signing the Board Minutes differ sharply. Dumanian portrays the negotiation process as essentially, a hold-up scenario: Schwartz exploited Dumanian's fear of not getting the money from the Wells Fargo account back, because Dumanian suspected that Schwartz had moved it to an offshore account. *Id.* at 100:20–22. According to Dumanian's testimony, he had no choice but to sign the Board Minutes:

> There's a concept here that if I had taken this to the
> authorities, it might have been a year or two before this
> would eventually have been worked out. And by that time,
> my medtech company and my dream of a mesh suture
> would not have been revivable. You know, we had bills to
> pay. We had science experiments that were ongoing. You
> know, there were things that had to be paid for. And, so,
> any delay in accessing this money was going to be the death
> of the company. And, so, this was something I had to sign
> so that the company would remain viable. I knew it was a
> horrible, horrible thing that was happening to me and my
> family, but I had no choice.

11

*Id.* at 101:23–102:9.

Dumanian also testified that, when he initially refused to sign the Board Minutes, Schwartz told him "you're going to sign this fucking document and you're not going to change a single word." *Id.* at 101:17–19. Finally, Dumanian testified that, during one of their conversations, Schwartz told him "I have your money," and implied that he would not return it unless Dumanian signed the document. *Id.* at 96:9–11; Pls.' Ex. 2, Decl. Dr. Gregory Dumanian Supp. Mot. Prelim. Inj. ¶¶ 25–26 ("Dumanian Decl.").

By contrast, Schwartz testified that he and Dumanian drafted the Board Minutes collaboratively. In the hearing, Schwartz pointed to a text message that Dumanian sent to Schwartz on the morning of September 5, where Dumanian said "Hey, am ready to respond to your proposal. Let's get this done this morning! I do have some questions and concerns though." Defs.' Ex. 53, Text Messages Between Mark Schwartz and Dr. Gregory Dumanian, at 2 (Sept. 5, 2019, 9:07 AM). According to Schwartz, he spoke to Dumanian on the phone for sixty-nine minutes, which, in Schwartz's view, constituted the "special emergency board meeting." Hr'g Tr. at 363:16–22. Schwartz testified that, after that conversation, Schwartz implemented changes to the Board Minutes that the two had agreed to on the phone. *See id.* at 363:23–364:5. A few hours later, Dumanian sent him the signed Board Minutes, and the two spent the rest of the day finalizing an announcement of the agreement that they would send to investors. *Id.* at 364:12–16.

Along with the Board Minutes, Schwartz also prepared, and Dumanian and his family later signed, a settlement agreement that released any legal claims that Dumanian or his family had or may have had in connection with the dispute. Pls.' Ex. 12, Mutual Settlement and Release Agreement § C(b) ("Settlement Agreement"). In an email to the Dumanians in the early morning of September 6, 2019, Schwartz wrote that "execution of the settlement agreement today . . . is necessary right away, to provide open and honest communication to restore systems, and for Company to be able to restore email communications . . . and return Mesh funds which are currently held in escrow." Pls.' Ex. 49, Email from Mark Schwartz to Dr. Gregory Dumanian, Randa Dumanian, and Adom Dumanian (Sept. 6, 2019, 7:05 AM).

Two days later, on September 9, 2019, Dumanian signed the Settlement Agreement and "forced" his wife and son to do the same. Hr'g Tr. at 105:8; *see* Settlement Agreement at 7.

## D. Procedural History

In the weeks after the Dumanians signed the Board Minutes and the Settlement Agreement, their relationship with Schwartz continued to deteriorate. A few days after the Dumanians signed the Settlement Agreement, Dumanian flew to Hamburg, Germany, with his family and Schwartz to give a lecture at a symposium. Hr'g Tr. at 110:8–14. Dumanian did not want to go, but felt it was necessary to promote the company and his invention. *Id.* at 110:15–19. Dumanian testified that, during the trip, he acted normally, and even sociably, with Schwartz because he still did not know where the money was. *Id.* at 111:8–9.

13

In fact, Schwartz had put the nearly $4 million in Mesh Suture funds that he had transferred out of the Wells Fargo account back into the account on September 6, the day after Dumanian had signed the Board Minutes. *Id.* at 197:5–12; *see* Pls.' Ex. 46 at 9. According to the Dumanians, however, they had no idea that this had occurred until sometime in October, when the Wells Fargo bank statements were produced in discovery in an interpleader case in the District of Colorado, in which Wells Fargo had named Schwartz and Dumanian as defendants.[4] Hr'g Tr. at 244:20–22, 533:5–18.

On October 20, 2019, Plaintiffs filed this lawsuit against Schwartz and his family. The lawsuit seeks a declaratory judgment pursuant to 28 U.S.C. § 2201(a), holding that: (1) the Board Minutes and Settlement Agreement are invalid because Dumanian signed them under duress (Counts I and II); (2) the Board Minutes are void because Schwartz convened the September 5, 2019, board meeting without providing the 48-hour notice required by the company bylaws (Count III); and (3) Dumanian validly terminated Schwartz's employment as CEO of Mesh Suture on August 31, 2019 (Count IV).

Throughout the duration of this lawsuit, Schwartz has continued to claim that he is the rightful CEO and Board Chairman and has acted on that authority. For example, in December 2019, Schwartz called a "special board meeting" at which he— acting, pursuant to the September 5 Board Minutes, as all five members of the

---

[4]     A Colorado district court granted summary judgment in favor of the Dumanians. *See Wells Fargo Bank, N.A. v. Mesh Suture Inc.*, No. 19-cv-03218-PAB-GPG, 2021 WL 2682724 (D. Colo. June 30, 2021), *aff'd*, 31 F.4th 1300 (10th Cir. 2022).

board—authorized a distribution of 293 "Series A" shares (as he calls them, "options") to himself, his family, and his friends (including, notably, his counsel in this litigation) at $10 per share. *See generally* Pls.' Ex. 17, December 27, 2019 Board Minutes; Pls.' Ex. 18, Capitalization Table & Shareholder Roster (Jan. 2020); Pls.' Ex. 19, Capitalization Table & Shareholder Roster (Aug. 15, 2019).

A month later, Schwartz filed a Chapter 11 bankruptcy petition purportedly on behalf of Mesh Suture in the United States Bankruptcy Court for the District of Puerto Rico, pursuant to which he demanded that $3.3 million in Mesh Suture's Wells Fargo bank account be transferred to a bank account with Banco Santander de Puerto Rico, purportedly Mesh Suture's "debtor in possession" account. Pls.' Ex. 21, Letter from C. Conde Torres to Wells Fargo Counsel (Jan. 9, 2020).[5] Schwartz later filed a confession of judgment in Maryland state court, as counsel for both Mesh Suture as debtor and MS Law Group, his personal corporation, as creditor, seeking repayment of a debt allegedly owed to MS Law Group for "unpaid legal services." Pls.' Ex. 22, Compl*., MS Law Grp., LLC v. Mesh Suture Inc.*, No. (Cir. Ct. Montgomery Cnty. Nov. 14, 2020).

For their part, Plaintiffs maintain that, since his termination on August 31, 2019, Schwartz has had no legal authority to act as CEO of Mesh Suture. And on at least three separate occasions, the Series A investors have voted to recognize Schwartz's termination as CEO and to nullify the Board Minutes and Settlement

---

[5] The bankruptcy court dismissed the petition because "it lacked a bankruptcy purpose as Mesh Suture was solvent and the case was essentially a two-party dispute among shareholders." *Wells Fargo*, 31 F.4th at 1304 n.2 (citation omitted).

Agreement as "procured through unlawful means." Pls.' Ex. 15, January 16, 2020 Board Minutes at 2; *see generally* Pls.' Ex. 14, 2d Written Consent Without Meeting (Nov. 14, 2019); Pls. Ex. 16, Stockholder Action by Written Consent Without Meeting (Nov. 28, 2020).

Plaintiffs filed a motion for a preliminary injunction on August 25, 2021, seeking "to stop Schwartz from continued unlawful actions" and from interfering with Mesh Suture's growth and development. Pls.' Renewed Mot. Prelim. Inj. at 9, ECF No. 213 ("Renewed Mot."). After some delay related to the COVID-19 pandemic, the Court held a three-day evidentiary hearing on the motion on March 17–18, and April 7, 2022.

## II. <u>Legal Standard</u>

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008)). And in order to obtain such relief, the parties seeking it—here, the Dumanians—carry the burden of persuasion by a clear showing. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

To obtain a preliminary injunction, the plaintiff has the preliminary burden to show: (1) a likelihood of success on the merits; (2) irreparable harm; and (3) that the balance of the equities favors emergency relief. Fed. R. Civ. P. 65(b)(1)(A); *see Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

The Court then weighs these factors in what the Seventh Circuit has called a "sliding scale" approach. *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). That is, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (internal quotations omitted). And "[w]here appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties." *Id.*

Additionally, the Court notes that Schwartz is the only Defendant who filed a response to Plaintiffs' motion.[6] Consequently, Plaintiffs urge that the remaining Defendants have "conceded the motion" and that Plaintiffs are entitled to a preliminary injunction against those Defendants by default.

The Court agrees that Defendants Yajia Hu Schwartz, Lindsey Schwartz, Leo Schwartz, Camila Lozano, Tax Lien Law Group, LLC, and Sulion, LLC have waived any argument in opposition to Plaintiffs' motion by failing to respond to it. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("[F]ailure to respond to an

---

[6]    Schwartz's response to Plaintiffs' motion purports to be on behalf of all Defendants. *See* Defs.' Counterclaimants' Resp. Opp'n Pls.' Mot. Prelim. Inj. at 1, ECF No. 228 ("Schwartz Resp.") But the brief is signed only by Schwartz, who has filed an appearance in this case only on behalf of himself. *Id.* at 15; *see* ECF Nos. 164, 175; *see also, e.g.*, Pls.' Reply Supp. Mot. Prelim. Inj. Ex. 2, Status Hr'g Tr. at 2:16–18 (Jan. 7, 2022), ECF No. 231-2.

Schwartz's response also purports to include a "motion for summary judgment," which is stricken without prejudice for its complete failure to comply with the Northern District of Illinois's local rules concerning summary judgment motions. *See* N.D. Ill. LR 56.1; *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (a district court is entitled to enforce compliance with the local summary judgment rules).

argument . . . results in waiver."). But that does not mean that Plaintiffs automatically are entitled to an injunction as to these Defendants. Rather, Plaintiffs retain the burden to make a clear showing that they are entitled to injunctive relief, irrespective of Defendants' seeming acquiescence. *See Mazurek*, 520 U.S. at 972; *cf., e.g.*, *AVCO Corp. v. Turn and Bank Holdings, Inc.*, No. 4:12–CV–01313, 2015 WL 435008, at *3, *6 (M.D. Pa. Feb. 3, 2015) (denying movants' unopposed motion for preliminary injunction because movants did not meet their burden under the preliminary injunction factors).

Finally, it bears noting that Schwartz's response engages very little, if at all, with the factual allegations and argument in Plaintiffs' motion and fails to cite any legal authority whatsoever. The Seventh Circuit has made plain that arguments devoid of legal support are waived. *See, e.g.*, *United States v. Davis*, 29 F.4th 380, 385 (7th Cir. 2022); *United States v. Barr*, 960 F.3d 906, 916 (7th Cir. 2020); *see also, e.g.*, *Tex. Hill Country Landscaping v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 413 (N.D. Ill. 2021) (refusing to reach party's argument on this basis). The Court therefore exercises its discretion and disregards the legal arguments in Schwartz's response brief.

### III.    Analysis

### A.    Likelihood of Success on the Merits

The first factor—"likelihood of success on the merits"—requires the plaintiff to make a "strong showing that she is likely to succeed on the merits" of her claim; a mere "possibility of success is not enough" to warrant emergency relief. *Ill.*

*Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). This showing "does not mean proof by a preponderance," but requires the plaintiff to provide facts and legal theories supporting "the key elements of its case." *Id.* at 763.

### 1. Duress Claims

Counts I and II of Plaintiffs' complaint allege that the Board Minutes and the Settlement Agreement are invalid because Dumanian signed them under duress. Under Illinois law,[7] economic duress ("duress") can invalidate a contract if (a) the plaintiff was induced to enter the contract by a wrongful act or threat of another, (b) under circumstances that deprived the plaintiff of free will. *Rissman v. Rissman*, 213 F.3d 381, 386 (7th. Cir. 2000) (applying Illinois law). The requisite wrongful act need not be legally actionable—it may be "wrongful in a moral sense." *Kaplan v. Kaplan*, 182 N.E.2d 706, 709 (Ill. 1962).

The requirement that the plaintiff be deprived of free will is a stringent one— the plaintiff must be left with no alternative but to enter into the contract. *Castellano v. Wal-Mart Stores*, 373 F.3d 817, 820 (7th Cir. 2004) (applying Illinois law). As such, courts are generally hesitant to rescind a contract under a duress theory if there was a "feasible legal remedy" available to the plaintiff as an alternative to the contract. *Oxxford Clothes XX, Inc. v. Expeditors Int'l of Wash., Inc.*, 127 F.3d 574, 579 (7th Cir.

---

[7]     Neither the Board Minutes nor the Settlement Agreement contains a choice of law clause, and the parties have not identified an "actual conflict" between the contract law of Illinois and that of another state, so the Court applies Illinois law to Plaintiffs' claims involving those documents. *East Coast Ent. of Durham LLC v. Hous. Cas. Co.*, 31 F.4th 547, 550 (7th Cir. 2022) (holding that "[i]n the absence of an actual conflict between Illinois law and the law of another state, the substantive law of Illinois applies" to a diversity case brought in Illinois federal court).

1997) (applying Illinois law) (collecting cases); *see, e.g.*, *Castellano*, 373 F.3d at 820 (settlement agreement was not product of duress where plaintiff had the option to sue to enforce prior, more favorable agreement). The "essential question is whether the threat has left the individual bereft of [the] quality of mind essential to [the] making of [a] contract." *Rissman*, 213 F.3d at 386 (quoting *Kaplan*, 182 N.E.2d at 709)).

### a. Wrongful Act or Threat

Plaintiffs assert that Schwartz committed a litany of crimes in connection with this dispute, including theft, embezzlement, and extortion. They also accuse him of defamation and various other torts. But a detailed discussion of those purported illegal acts is unnecessary here, because Plaintiffs have shown, on multiple grounds, that Schwartz's behavior was wrongful in a moral sense.

First, Schwartz's taking of Mesh Suture's funds without authorization— whether or not it formally fell within the definition of a particular crime or tort—was clearly improper. Plaintiffs contend that Schwartz had no right to access the account at all at the time he transferred the money because he had been fired as Mesh Suture's CEO. But even granting the assumption that Schwartz was still the CEO at the time (or believed himself to be), Schwartz's unauthorized expropriation of the company's money to an account that "didn't have anything to do with" Mesh Suture starkly violated his fiduciary responsibilities as an officer of the company. Hr'g Tr. at 461:15.

Next, Dumanian credibly testified that, during one of their phone calls after

Schwartz had taken the money, Schwartz threatened Dumanian by saying that he had Dumanian's money and implied that he would not return it unless Dumanian signed the Board Minutes. This extortive threat not to return the money unless Dumanian agreed to give him control of the company was unquestionably "wrongful" as well. *See* RESTATEMENT (SECOND) OF CONTRACTS § 176 cmt. b (AM. LAW INST. 1981) (stating that it is wrongful to "threaten[] not to surrender" something of value unless the other party enters into a contract).

During cross-examination, Defendants' counsel made much of the fact that the recording of the September 3 phone call does not contain the statement "I have your money." But both men testified that they talked over the phone multiple times over the two days after Schwartz had taken the money, *id.* at 202:12–15, 359:19–25, and Dumanian stated that he did not remember on which day Schwartz told him that he had Mesh Suture's money. *Id.* at 202:12–15. It is hardly surprising that Schwartz was on his best behavior during the one call that he had decided to record and present to this Court. The Court accordingly gives little weight to the fact that the statement itself is absent from the recorded call.

The Court finds Dumanian's consistent testimony particularly credible when viewed in the context of the entire negotiation process (if it can be called as much), the entirety of which bespeaks bad faith. The record convincingly shows that Schwartz exploited Dumanian's fears that Mesh Suture would fail if Schwartz did not return the money. Schwartz knew that Dumanian had no reasonable alternative but to acquiesce because Schwartz had drained Mesh Suture of all of the funds it

needed to continue the research, development, and regulatory approval processes required to bring the product to market. As Dumanian explained at the hearing, any "delay in accessing" the money likely would have dealt potentially fatal damage to the company. *See* Hr'g Tr. at 101:23–102:9. In fact, according to Dumanian, he believed at the time he signed the Board Minutes that Schwartz had already transferred the money to his Hong Kong bank account, where (in Dumanian's view) United States authorities could not reach it. *Id.* at 97:5–8, 105:11–15. From Dumanian's perspective, even litigation was not an option; the only way to get the money back was to do what Schwartz asked. The absence of legal recourse is a "hallmark" of duress. *See Oxxford Clothes XX*, 127 F.3d at 579 ("The hallmark of duress or extortion is that the victim has no feasible legal remedy.").

The evidence in the current record further shows that Schwartz wore Dumanian down through a campaign of insults, threats, and unjustifiably coercive pressure. To be sure, tough negotiations do not a duress claim make. But Schwartz's actions did more than drive a hard bargain. For example, Schwartz locked all three Dumanians out of their company emails and work databases on September 2, the day that he first proposed that Dumanian sign the Board Minutes. Hr'g Tr. at 723:5–17, 725:18–21. And, when the Dumanians pushed back on the settlement agreement and proposed changes, Schwartz rejected them; according to the Dumanians, Schwartz told Dumanian at one point that "you're going to sign this fucking document and you're not going to change a single word." *Id.* at 101:16–19; *see id.* at 109:3–10, 110:3–6.

22

Finally, despite knowing that the Dumanians were represented by counsel, Schwartz (who is an attorney) never asked to talk to the Dumanians' lawyer and continued to communicate with the Dumanians directly during the negotiation process. *Id.* at 468:12–469:13. As Plaintiffs point out, this was a violation of Schwartz's ethical obligation not to communicate with an opposing party directly if he is aware that the party is represented by counsel. Ill. R. Prof. Conduct 4.2 ("[A] lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.").

For the foregoing reasons, the Court finds that Plaintiffs have shown the requisite "wrongful act or threat" to succeed on their duress claims.

### b. Circumstances Indicating Lack of Free Will

Plaintiffs also must show that the circumstances surrounding Schwartz's wrongful threats deprived the Dumanians of free will. In other words, they must put forth evidence that, at the time the Dumanians signed the Board Minutes and Settlement Agreement, they lacked "the quality of mind essential to the making of a contract." *Rissman*, 213 F.3d at 386 (quoting *Kaplan*, 182 N.E.2d at 709).

The evidentiary record abounds with such evidence. Dumanian testified that, when he learned that Schwartz had taken the money from the Wells Fargo account, he became "despondent" and feared that his dream of launching a successful medtech company based on his mesh suture idea was ruined. Hr'g Tr. at 92:7, 94:5–8, *see id.*

23

at 101:24–102:1. He recalled that, over the next week, he was not himself. He tried to cancel scheduled surgeries and left work early. *Id.* at 94:6–8. He did not eat or sleep normally. *Id.* at 191:21–23. He could not think clearly. *Id.* at 191:22–23. In short, he was "a mess." *Id.* at 192:12. The Court found this testimony compelling, and it weighs heavily in favor of Plaintiffs' claim that he signed the Board Minutes and Settlement Agreement under duress.

Testimony from Randa Dumanian and Adom Dumanian bolsters that conclusion. Randa Dumanian observed firsthand the effects Schwartz's actions had on her husband during the period in question. She testified that, when Dumanian told her the money was missing from the Wells Fargo account, Dumanian seemed "in shock." *Id.* at 531:3. She corroborated Dumanian's testimony that, during that following week, Dumanian "had absolutely no appetite" and "could not fall asleep" for more than "an hour or two." *Id.* at 545:2–4. As she recalled, Dumanian was "broken" at the time he signed the Board Minutes. *Id.* at 544:25.

Adom Dumanian similarly recalled that his father seemed "in a daze" when he called to tell his son that the money was missing. *Id.* at 697:25. Instead of his usual "upbeat, high energy, [and] positive" demeanor, *id.* at 698:4, Dumanian seemed "at a loss." *Id.* at 701:1. And, Adom Dumanian testified, neither he nor his mother recall anything other than Schwartz's expropriation of Mesh Suture's money and the fallout from Schwartz's termination that could have caused such a dramatic shift in Dumanian's temperament. *Id.* at 545:6–10, 701:5–8.

Moreover, Randa Dumanian and Adom Dumanian's testimony supports the

claim that they, too, were under duress at the time they signed the Settlement Agreement. Randa Dumanian testified that, when her husband told her that the money was missing, she descended into "utter panic" and "began sobbing." *Id.* at 531:7–8. After Dumanian had signed the Board Minutes, she remembered feeling "devastated" and "depressed" that her husband's "life's work" had ended. *Id.* at 536:8–10. She recalls that, during this period, she had problems eating, nausea, tremors, inability to focus, and constant anxiety. *Id.* at 546:7–10.

Randa Dumanian's contemporaneous diary entries corroborate this testimony. In the entry for September 6th, she described her family as "heartbroken [and] pummeled" and wrote that her anxiety was "through the roof," and that she was "paralyzed" and "shak[ing] like a leaf most of [her] waking hours." Pls.' Ex. 62, Diary of Randa Dumanian at 12–13 (Sept. 6, 2019). Similarly, Adom Dumanian recalled that he witnessed his mother "every progressive day becoming more and more dejected, depressed and at a loss for what to do." Hr'g Tr. at 700:12–13. And finally, Randa Dumanian testified that, just like her husband, she signed the Settlement Agreement because she felt that she had no other option to get the money back. *Id.* at 543:10–17. She recalled feeling "utter despair" after signing the document, which represented, in her words, "the death of everything . . . we had worked for." *Id.* at 543:20–21.

Adom Dumanian also recounted his own mental state during the events in question. He testified that he had no appetite as a result of stress and lost an estimated five to ten pounds during the two weeks that Plaintiffs had no knowledge

25

of where the money was. *Id.* at 701:12–13. Randa Dumanian testified to much the same—during the events in question, she observed her son "losing weight visibly" and recalled his mood as "somber" rather than his usual "jovial" temperament. Hr'g Tr. at 545:18–19. Finally, like his parents, Adom Dumanian testified unequivocally that he signed the Settlement Agreement because he "felt like [he] had no other option to get the money returned." *Id.* at 700:3–4.

When taken as a whole, the record before the Court comprises strong evidence that the Dumanians lacked the quality of mind essential to the formation of a valid contract at the time they signed the Board Minutes and the Settlement Agreement. By contrast, Defendants have offered no coherent arguments undermining the credibility of Plaintiffs' testimony. Nor have they supplied any alternative explanations for why Dumanian would have signed a document handing near-complete control over the company to the person whom he had, only five days earlier, purported to fire as CEO, or why he and his family almost immediately signed another document preventing themselves from pursuing any legal recourse based on those events.

Indeed, the sum total of Defendants' evidence in response is Schwartz's testimony at the hearing. And the Court found that testimony wholly incredible for several reasons. First, Schwartz's demeanor and attempts to respond to certain questions (such as why he took the money in the first place) lacked credibility. His responses during cross-examination were meandering, needlessly complicated, and muddled. For example, in response to pointed questions by the Court, Schwartz

insisted that the new board structure did not take away Dumanian's ability to be represented on the board, even though the amended bylaws clearly gave Schwartz *carte blanche* on its constitution.  *Id.* at 364:21–370:21.  Furthermore, Schwartz has consistently manifested a conscious disregard for the ethical obligations incumbent upon attorneys and corporate officers.  *See, e.g.*, Hr'g Tr. at 128:3–132:22 (discussing Schwartz's representation of both creditor and debtor in a confession of judgment in which Mesh Suture purportedly owed money to Schwartz's personal corporation).  The Court accordingly deems his testimony to have little, if any, probative value.

In sum, the Court finds that, based on the current record—particularly, the testimony at the evidentiary hearing—Plaintiffs are likely to be able to establish both elements of duress under Illinois law as to the Board Minutes and the Settlement Agreement.  As a result, the Court concludes that Plaintiffs are likely to succeed on the merits of their duress claims.[8]

## 2. Termination Claim

Plaintiffs also seek a declaratory judgment that Dumanian lawfully exercised his contractual right to terminate Schwartz as CEO pursuant to Schwartz's

---

[8]    What is more, having found that Plaintiffs are likely to succeed on the merits of Counts I and II, the Court need not consider whether Plaintiffs are likely to succeed on the merits of their other claim as to the invalidity of the Board Minutes.  *See Girl Scouts of Manitou Council*, 549 F.3d at 1096 ("Because [Plaintiff] surpasses the threshold on at least one of its causes of action, we need not discuss [Plaintiff's] likelihood of success on its remaining nine claims."); *see also id.* (to be entitled to an injunction, a plaintiff must show a likelihood of success as to "at least one" of their claims); *Domanus v. Lewicki*, 857 F. Supp. 2d 719, 724 (N.D. Ill. 2012) (same).

employment agreement. The Court finds that Plaintiffs are likely to prevail on this claim as well.

Under New York law,[9] "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022) (quoting *Kolbe v. Tibbetts*, 3 N.E.3d 1151, 1156 (N.Y. 2013)). "'[T]he key inquiry at the initial stage of interpreting a contract' is therefore 'whether it is ambiguous with respect to the issue disputed by the parties.'" *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (quoting *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010)). A contract is unambiguous if "the language it uses has a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Donohue*, 184 N.E.3d at 867 (quoting *Greenfield v. Philles Recs.*, 780 N.E.2d 166, 170 (N.Y. 2002)).

Plaintiffs argue that Dumanian had the unilateral authority to fire Schwartz pursuant to the termination clause in Schwartz's employment agreement, which states:

> Either Party or Gregory Dumanian shall have the right to terminate this Agreement with or without cause on 90 days' written notice to the other Party at any time.

---

[9]     Schwartz's employment agreement states that it "shall be interpreted in accordance with the laws of the State of New York," and neither party argues to the contrary. Employment Agreement ¶ 9(f).

Employment Agreement ¶ 6(a). Plaintiffs contend—and the Court agrees—that this language clearly and unambiguously confers on Dumanian the unilateral right to terminate Schwartz's employment at any time and for any reason. To the extent Defendants believe any ambiguity exists, they have waived any argument to that effect by failing to raise it in their response brief. *See Bonte*, 624 F.3d at 466.[10] Accordingly, for purposes of the instant motion, the Court finds that Plaintiffs are likely to succeed on the merits of their claim that Dumanian validly terminated Schwartz's employment as CEO.[11]

## B.  Irreparable Harm

In order to show that they would suffer irreparable harm without injunctive relief, Plaintiffs must "demonstrate that irreparable injury is likely." *Winter*, 555 U.S. at 21 (emphasis omitted); *see Orr*, 953 F.3d at 502 (the standard "requires 'more

---

[10]  During the hearing, Schwartz offered an alternative interpretation of the termination clause. In his view, the clause allowed Dumanian to terminate the "agreement," but not Schwartz's CEO position itself. Hr'g Tr. at 310:16–20. Because Schwartz did not include that argument in his response to Plaintiffs' motion, the Court is not required to consider it. But for the sake of completeness, the Court finds Schwartz's theory to be both manifestly unreasonable and expressly foreclosed by the employment agreement's merger clause, which states that the employment agreement "contain[s] the entire understanding of the parties with respect to the subject matter hereof." Employment Agreement ¶ 9(d).

[11]  The parties dispute whether Dumanian was required to give Schwartz ninety days' written notice before firing him. But that issue is immaterial for purposes of the instant motion because any breach of the notice requirement would not have invalidated the termination. Rather, it would mean only that the termination did not take effect until November 29, 2019, when the contractual notice period expired. *See Andrews v. Sotheby's Int'l Realty, Inc.*, No. 12 Civ. 8824(RA), 2014 WL 626968, at *5 (S.D.N.Y. Feb. 8, 2014) ("New York courts have held that if the employer has the unconditional right to terminate the contract of employment after a certain notice," a purported termination "has the effect of notice to terminate" and the employment ends at "the time the contract would have terminated if notice had been given." (citation omitted)); 19 WILLISTON ON CONTRACTS § 54:49 (4th ed. updated 2022) (same). That distinction matters little to the injunctive relief Plaintiffs seek here; namely, a declaration that Schwartz is not *currently* the CEO of Mesh Suture.

than a mere possibility of harm'" (quoting *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017)). "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021).

Plaintiffs contend that, absent a preliminary injunction, they will suffer irreparable harm because Mesh Suture is likely to go out of business—or at the very least, lose significant opportunities for growth—if Schwartz continues to interfere with its operations. A likelihood of lost business is a form of irreparable injury because it is difficult to "pin[] down what business has been or will be lost." *Id.* (quoting *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632–33 (7th Cir. 2005)); *see In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) (harm to business that "cannot be reliably estimated" was irreparable); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("[A] damages remedy may be inadequate if it comes 'too late to save plaintiff's business'" (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984))).

Plaintiffs have credibly testified that Mesh Suture is "at the brink of insolvency" because the turmoil and uncertainty caused by Schwartz's actions have prevented the company from acquiring needed funding. Hr'g Tr. at 560:17; *see id.* at 562:11–15. As Randa Dumanian put it, the control dispute has made Mesh Suture "radioactive" to investors. *Id.* at 562:15. Similarly, Zabelle Crosson, the Series A representative on Mesh Suture's board, testified that the company has "only three to four months of cash flow" on hand, *id.* at 645:20, and that Mesh Suture has been

unable to secure funding since the feud between Dumanian and Schwartz began. *Id.* at 646:21–24. Dumanian himself has testified to the same. *Id.* at 134:13–15; Dumanian Decl. ¶ 38.

In order to raise money, the Dumanians intend to sell the company's only major tangible asset—an office and manufacturing building in Puerto Rico, which was appraised (according to Dumanian) at somewhere between $3 million and $5 million. But, as Crosson testified, the control dispute prevents them from doing so. *Id.* at 646:7–15 (stating that Plaintiffs are "very stuck" as to the sale of the building because they "are not designated yet as the formal and final organization that can make that transaction." *Id.* at 646:10–12). Without injunctive relief preventing Schwartz from interfering with the sale, this revenue stream, too, is unavailable to the company.

Additionally, Plaintiffs have offered convincing evidence that the financial woes caused by Schwartz's interference have impaired, and will continue to impair, the company's progress on the regulatory approval front. Dumanian contends that two randomized clinical trials at major United States research hospitals will not go forward if Mesh Suture cannot raise the money to fund them. *See* Dumanian Decl. ¶ 34–35. What is more, the trials currently underway in the United Kingdom and Mexico require Mesh Suture to spend money on patient monitoring and data collection—money that Mesh Suture currently does not have and cannot raise from investors. Hr'g Tr. at 562:1–10.

For their part, Defendants have pointed to nothing in the record to rebut these claims. Indeed, Schwartz himself admitted that "there's no way this company can

survive on its current trajectory." *Id.* at 402:10–12; *see also id.* at 401:18 (calling Mesh Suture's financial situation "pretty dire."). In light of the credible and uncontroverted testimony from Plaintiffs, the Court finds that Plaintiffs have shown that Mesh Suture will "likely" fail if an injunction does not issue and, accordingly, have met their burden to show irreparable harm.

## C.  Balance of the Equities

As to the final factor—the "balance of the equities"—the Court must "balance the harm the moving parties would suffer if an injunction is denied against the harm the opposing parties would suffer if one is granted" and consider "the effects of a decision on non-parties." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644 (7th Cir. 2022). This latter consideration is sometimes called the "public interest." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

Plaintiffs assert that, absent injunctive relief, their company will fail and Dumanian's invention will not be brought to market. As explained above, Mesh Suture's current financial situation makes that claim particularly credible. The potential injury to Plaintiffs from this scenario is obvious enough, but the potential harm does not end there. Not only would Mesh Suture's failure harm Dumanian and his family, who have invested extensive time, money, and effort in the company and its product for nearly fifteen years, but it would also harm the company's shareholders (including Schwartz), who collectively stand to lose more than $10 million if the company collapses.

Conversely, Defendants have identified no potential injury to them from an injunction prohibiting Schwartz from enforcing the allegedly invalid agreements or holding himself out as its CEO. Indeed, according to Schwartz, throughout the dispute "[his] desire was to be . . . as far away from this nonsense as possible, and still is." Hr'g Tr. at 370:7–9. And Schwartz, too, has a stake in Mesh Suture's success, given that he still owns a significant percentage of Mesh Suture's stock.

The public interest also favors injunctive relief. Facilitating access to new medical treatments is unquestionably in the public interest. *See, e.g.*, *Smith & Nephew, Inc. v. Interlace Med., Inc.*, 955 F. Supp. 2d 69, 80 (D. Mass. 2013); *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 890 (D. Ariz. 2004) (public interest favors removing barriers to access to medical services); *Collagenex Pharms., Inc. v. Thompson*, No. CIV.A. 03-1405(RMC), 2003 WL 21697344, at *11 (D.D.C. July 22, 2003) (the public has a strong interest in the "initial development of new drugs"). And all parties in this case agree that Dumanian's invention has the potential to benefit patients across the country and worldwide. *See* Hr'g Tr. at 406:23–407:3 (Schwartz stating that he "firmly believe[s] in" the invention and that the company has "a very bright future").

When the Court weighs, on the one hand, Plaintiffs' strong likelihood of success on the merits and the potential irreparable harm to Plaintiffs, their investors, and the public against, on the other, the negligible injury to Defendants from an injunction, the Court finds that the balance of the equities heavily weighs in favor of

injunctive relief.  Therefore, Plaintiffs are entitled to a preliminary injunction in this case.  *See Valencia*, 883 F.3d at 966.

## D.  Scope of Injunctive Relief

Having determined that Plaintiffs are entitled to preliminary injunctive relief, the Court must determine the proper scope of the injunction.  In doing so, it is mindful that the injunction "must be broad enough to be effective," but that it "cannot be 'more burdensome to the defendant than necessary to accord complete relief to the plaintiffs.'"  *Consumer Fin. Prot. Bureau v. Consumer First Legal Grp., LLC*, 6 F.4th 694, 712 (7th Cir. 2021) (first quoting *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir, 2010), and then quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

The precise nature of the injunctive relief that Plaintiffs seek is less than clear from their briefs,[12] but it is in the court's discretion to determine the contours of the injunction, *see id.*, guided by the "extent of the violation established."  *Califano*, 442 U.S. at 702.  Here, Plaintiffs have shown a likelihood of success on the merits of their claims that the Board Minutes and the Settlement Agreement are unenforceable, and that Dumanian's termination of Schwartz is valid.  They also have shown that the uncertainty created by the Board Minutes, the Settlement Agreement, and Schwartz's refusal to accept his termination has created a substantial likelihood of

---

[12]    In their renewed motion, Plaintiffs request injunctive relief "[h]olding that Plaintiffs have a strong likelihood of success on the merits regarding" each of their claims.  Renewed Mot. at 47–48.  But an injunction must actually "enjoin" something; that is, "tell[] someone what to do or not to do." *Garland v. Aleman-Gonzalez*, 142 S. Ct. 2057, 2063 (2022) (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)).

irreparable harm. Therefore, the Court concludes that preventing Defendants from enforcing the Board Minutes or Settlement Agreement and preliminarily enforcing Schwartz's termination by preventing Schwartz from acting in any capacity as CEO of Mesh Suture is the most appropriate form of injunctive relief in this case.

Accordingly, the Court grants Plaintiffs a preliminary injunction barring Defendants from taking any action to enforce, or taking any action directly or indirectly in reliance on, the Board Minutes or the Settlement Agreement, during the pendency of this litigation. The Court further enjoins Mark Schwartz from taking any action based upon, or making any representation in reliance on, his purported authority as CEO of Mesh Suture, until this litigation concludes. This shall include any access to or authority over Mesh Suture's finances to which his employment as CEO would otherwise entitle him.

Additionally, the Court notes that the "options" offered by Schwartz to third-parties, including his family members and the attorney of record in this case, may impede the company's efforts to obtain additional funding. Consistent with the Court's preliminary ruling as to the invalidity of the Board Minutes and Settlement Agreement, it is likely that Schwartz lacked the authority to offer those options in the first place and that, therefore, those options were void from the start. That said, those third-party option-holders are not before this Court, and so the Court will not say any more about them now.

Pursuant to Rule 65(d), a separate order setting forth the specific terms of the injunction and describing in detail the specific acts enjoined shall follow this order.

### E.    Bond

Rule 65(c) provides that an injunction may issue "only if" the movant posts a bond, or a "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). As the text of the Rule suggests, the amount of bond is subject to the district court's discretion. *Gateway*, 35 F.3d at 1141.

Plaintiffs argue that appropriate "amount" of bond is no bond at all. They claim that this is a case where "[t]here is no reason to require a bond" because "there [is] no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). Under the circumstances, the Court agrees to a large extent. Schwartz and the other Defendants had a chance to articulate the harms they would suffer from the issuance of an injunction. But no Defendant other than Schwartz even responded to the motion, and Schwartz's response contains no allegations that he would be injured by an injunction against *him*—only a statement that irreparable harm will follow if "the Dumanians are not enjoined immediately" (a seeming reference to Defendants' own motion for a preliminary injunction). Schwartz Resp. at 13. The Court will not make Defendants' argument for them. *See Horne v. Elec. Eel Mfg. Co.*, 987 F.3d 704, 727 (7th Cir. 2021) ("Courts generally do not craft new arguments for a party, especially in civil cases and especially when the party is represented by counsel.") The Court also notes that the company's continued operation and success will confer substantial

36

benefits on Schwartz by increasing the value of his substantial holdings in the company.

That said, if Plaintiffs' claims were to fail at the completion of this case and Schwartz shows that he was wrongfully enjoined, Schwartz likely would have suffered some financial injury from the loss of his position and board seats. Accordingly, after considering the record in this case and exercising its discretion, the Court requires Plaintiffs to post a surety bond in the amount of fifty-thousand dollars ($50,000). The Court finds that this amount is sufficient to pay the costs and damages sustained by Schwartz if the Court ultimately finds that he has been wrongfully enjoined or restrained.

## IV.    Conclusion

Because Plaintiffs have satisfied their burden as to all of the elements necessary to obtain a preliminary injunction, Plaintiffs' motion for a preliminary injunction is granted. A separate order setting forth the terms and details of the injunctive relief pursuant to Rule 65(d) shall follow.


**IT IS SO ORDERED.**                    **ENTERED: 7/13/22**

**John Z. Lee**
**United States District Judge**

37