IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GREGORY DUMANIAN, RANDA DUMANIAN, and ADOM DUMANIAN, | ) ) ) | |
| *Plaintiffs/Counterclaim Defendants,* | ) | |
| v. | ) | Case No. 19-cv-6771 |
| MARK SCHWARTZ, YAJIA HU SCHWARTZ, LINDSEY SCHWARTZ | ) ) | JURY TRIAL DEMANED |
| LEO SCHWARTZ, CAMILA LOZANO, TAX LIEN LAW GROUP, LLC, and SULION, LLC, | ) ) ) | |
| *Defendants/Counterclaimants.* | ) | |

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PER R. 56(a)(d-f)(h) AND TO DISMISS (D.16), REINSTATE (D.47, 60, 66, 77), RECONSIDER (D.90,120,143), DISMISS (21-Cv-01780), DENY (D.285), AND FOR CRIMINAL & SANCTIONS R. 11 & 56(h)[1]**

---

NOW COMES Defendants Mark A. Schwartz, Yajia Hu Schwartz, Tax Lien Law Group and Sulion, ("Defendants") by the Undersigned, and state as follows:

<u>INTRODUCTION</u>

Dr. Schwartz faces criminal jeopardy from the fabricated and perjured claims in this case. The Dumanians have perpetrated a fraudulent scheme to deceive this Court and frame Schwartz for crimes they committed. Despite their credible highly educated backgrounds, there is no escaping the fact that virtually every aspect of the Plaintiffs' case is an invented fiction, provably false and furthered by fraud, lies and perjury before this Honorable Court.

The purpose of this motion is to cause the Court to undertake a thorough review of the evidence presented herein, necessary to ensure fairness and impartiality in the legal system and to prevent manifest injustice. As shown herein, the Dumanians have perpetrated a sentient and malicious fraud upon this US District Court, by lying, obfuscating, and perjuring themselves

---

[1] Due to size & upload limitations the exhibits referenced herein will be provided on USB and Dropbox link.

regarding nearly every critical and material element of their sham duress case, by framing Schwartz who is presently facing criminal jeopardy as a result. Justice demands that this Honorable Court undertake a thorough review of the evidence presented herein and shut down the fraudulent charade and criminal sham before it. Dismissal, Criminal Referral, and Sanctions are warranted to correct a manifest injustice and to send a clear message that no one is above the law. [2] [3]

## RELEVANT BACKGROUND AND OVERVIEW

**The Dumanians' Plan and Plot To Take Over Control Of Mesh Suture To "F- The Schwartzes" and Use Armenia To Obtain Approval As A Suture**

Exact Under penalty of perjury Dumanian falsely denies staging **"any type of coup"** (H. 66:10-11), that "**any**" of his or his family's actions were **"rogue"** (H.72:17-21), denies "**any improper actions … during Labor Day Weekend 2019**" (D.Dec.D.60-2,¶29) and falsely swears "There is **no reason other than extortion** for me to have **given away my company**" [4] [5] (Id. ¶53). Dumanian's testimony is false. In fact, the Dumanians had a longstanding plan and plot to take

---

[2] Further, the Court's prior Opinion and Orders (D.232-4), upon which the Dumanian's motion for summary judgment (D.285) critically relies, should be stricken as the product of fraud, false testimony, and perjury, as shown herein. *Hunter v. Thomas*, 173 F.2d 810 (10th Cir. 1949).Where it has been shown that, after district court made its findings, conclusions, and entered an injunction, and that crucial witness had committed perjury, a district court commits reversible error in continuing to credit witness's testimony without inquiring into extent of perjury or granting other relief. *Rakovich v. Wade*, 602 F. Supp. 1444 (7th Cir. 1985). District Courts have broad and continuing discretion to reconsider prior decisions, especially as regards to non-final orders. *Patrick v. City of Chi*i., 103 F. Supp. 3d 907, 911 (N.D. Ill. 2015); Fed. R. Civ. P. 54(b); *Matter of Prince*, 85 F.3d 314, 324 (7th Cir. 1996); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12, 103 S. Ct. 927, (1983)

[3] Further, Defendants' counterclaims and prior motions for summary judgment should be reinstated and granted on all counts, as there is no way for the Dumanians to get to a jury or prevail on provably false and perjured claims. *Scott v. Harris*, 550 U.S. 372 (2007)

[4] "On August 31, I fired him. On September 5th, I gave him the company" (H.106:4-8)

[5] Dumanian did <u>not</u> "**give away**" any company that was "**his**" alone by signing agreements requiring that company to "**truly have board meetings with independent members**" in order to resolve "**the problem**" between "**me and Mark**" – Critically, this was the solution Dumanian both <u>wanted</u> (Def. Ex. 90) and, <u>proposed</u> (Def Ex. 51)(<u>Ex. A</u>): Schwartz agreed, as this was indeed "A resolution that would be a lasting peace between the two of us, that would set up a road map -- and a mechanism for shared stewardship and success going forward. The way we did that was – essentially deciding that it was the two of us and -- three other board members. So, …"by going down to a five-member board.., as long as all three of those were independent, we could transition from a Mark and Greg company to a company where we still owned most of the shares, but the decisions where we disagreed could be decided by people from the industry who were familiar with situations we were going through and could guide us to get there." (H.361:15-362:8) "The key piece is that everyone that's not us is independent and qualified" (H.362:20-21). Moreover, Dumanian's own testimony regarding his proposals in (Def. Ex. 51) is fatal to his fraudulent and perjured claims of duress in this case: "**You're listing 1 through 6, various items that you want to be part of the board resolutions agreement with Mr. Schwartz, correct**? A. **Yes**. Q. **And, in fact, you're negotiating these terms in the discussion with your wife. You're detailing what would be acceptable to you, correct**? A. **Yes**. (H.242:3-10) Q. **The subject of the money is never even mentioned once, is it? A. No.** (H.243:11-15)

control of Mesh Suture ("Mesh") to "Fuck the Schwartz's" (**Grp_Ex.A**) and use Dumanain's fraudulent Armenia data to obtain approval as a suture (**Grp_Ex. B**) – a rogue personal scheme they concealed from Schwartz, the Company, and its Board, both **before, during, and after** purportedly settling the dispute, and causing the very economic conditions they attempt to foist upon Schwartz by perjury.

Indeed, the overwhelming objective record evidence of the Dumanians' longstanding takeover plot is inescapable: Armenia and hatred motivated Randa to try to frame Schwartz for bank fraud March 6, 2019, one day after Schwartz tried to fire her and begged Dumanian to support his decision (Grp_Ex. B) (Def. Exhs. 5-6) Instead, they colluded to defraud Schwartz and takeover Mesh (Id.)(G.Dep.,p.274-293). By April 2019, Randa was already seditiously urging Dumanian to "**assume the reins**",[6] pleading with him, "**I beg you to remain vigilant**" so Schwartz would not find out, warning "**MAS is VERY perceptive**" and to use private emails only: **"please use RCN"** (Id.)(Def. Ex.8). Randa expresses the same concealed animus and seditious intent in another email on June 10, 2019.[7] [8] [9] By August 12th, one week before the August 19th board meeting, Randa's malicious and subversive intent is clear: ("Subject: **Fuck them all**. I may just vomit at Yajia's email to the team. **Greg, you need to step up to the plate**.") (Id)(Def.Ex.10) When asked about this email during her discovery deposition, Randa admits "**I was pleading with greg to take action**" (Id.)(R.

---

[6] Dumanian lies to cover up their takeover scheme: "Q. Did you ever have conversations with your wife about **assuming the reins** of the company while Mr. Schwartz was still working for the company? A. **No.** (G Dep. P. 98:21-24)

[7] "**Gregory DO NOT SEND THIS he's an attorney. He will flip out that you're putting this in writing**. CALL ME TO DISCUSS" "you're fired" to Randa **But I have highest salary (which is actually Greg's) so I'm shutting up**. **and WHO THE FUCK DOES YAJIA think she is telling you at AWR "you're doing great Greg"?!?!?!**" (Def. Ex. 9)(Id.)

[8] But compare Randa's duplicitous trial testimony: "Q. Would it also be fair to say that sometimes you're difficult to deal with? A. Absolutely not. I demand transparency and mutual respect, as well as excellence." (H.576:1-4); "This was not a clash of personalities. It was a clash of values." (H.575:17-18); "there was a clash of values at Mesh Suture between the Dumanians and the Schwartzes. (H.581:12-16), as against (Def. Exhs. 6, 8, 9, & 10, 12, 16, & 162 (*8.26.19 Mesh Suture Standup Mtg Video Posted By Dumanian on Youtube*, and Pl.Ex.62,) which establish otherwise.

[9] And Dumanian's: "Q. **So, by August 12, 2019, your family's attitude towards the Schwartzes was to F them all, correct**? A. I think **the e-mail speaks for itself.**" (H.177:7-24)

Dep p.208-210) Critically, the Dumanians' hatred, collusion, and secret takeover plot started in earnest long before the August 19th board meeting and both of the funds transfers at issue. (Id.)

To "F- The Schwartzes" and use his fraudulent Armenia study for approval as a suture, Dumanian needed to: *Control Mesh's board*, but Schwartz was Board Chairman in 2019, so Dumanian and Randa commit perjury 21 times falsely swearing otherwise, as set forth in **(Grp_Ex. C)**; *Force Schwartz to cancel or sell his shares to him*, via extortion, so Dumanian could overtake Schwartz in any shareholder or proxy battle, because Schwartz was Mesh's largest shareholder,[10] and commit numerous acts of perjury to coverup their fraud and attempts to extort Schwartz on August 19th **(Grp_Ex. D)** and August 22nd **(Grp_Ex. E)** to do so; *Remove Schwartz as CEO,* to prevent Schwartz from designating an independent board member in that capacity, so the Dumanians perjure themselves 21 times re: Schwartz's Board Chairman status **(Grp_Ex. C)** and 4 times re: Dumanian's and Schwartz's 2019 Employment Agreements,[11] as detailed in **(Grp_Ex. F)**; *Control The $4M at Wells Fargo* to fund their scheme, so Dumanian commits perjury 14 times to falsely accuse Schwartz of bank fraud in connection with opening of Mesh's Wells Fargo Acct in 2017 in order to coverup his own criminal bank fraud at Wells Fargo on September 3rd 2019, as set forth in **(Grp_Ex. G)** to criminally defame Schwartz's authority over the account, despite having no corporate or board authority to do so following his termination on September 1st and permanent removal from Mesh's Board on September 2nd, 2019 at the Special Board Meeting Dumanian convened which he also commits perjury about as set forth in **(Grp_Ex. M)**; and *Control*

---

[10] Schwartz attained this status in January 2018 by leading Mesh's first financing round as its CEO, and investing $450,00 in the round, $90,000 more than Dumanian. (See, Grp_Ex. D, Cap. Table & Official Shareholder Roster, Pl.Ex.18., Pg.2, highlighted red)

[11] Including Dumanian's perjury that his 2019 employment contract identifies him as board chairman, which it does not, in order to portend having the corporate and board authority to do more than merely give Schwartz 90 days' notice of termination of his Employment Agreement, but overarching and unilateral carte-blanche to remove Schwartz on the spot from his position as CEO, install his wife Randa to replace him, and stage an armed takeover Mesh's corporate assets and bank accounts, all with no notice, board meeting, or vote of any kind.

*Advanced Suture*, ("ASI") to control Mesh's licensed patents, trademarks, and internet domains, so Dumanian <u>commits perjury 14 times</u> to deny and steal Schwartz's capital investment, ownership & control of ASI, falsely attesting, inter-alia, that he is its <u>only</u> shareholder, as set forth in (**Grp_Ex. H**)[12] To achieve these ends, they resort to fraud, theft, extortion, and perjury, as shown herein.

**I.  Perjury Re: Schwartz' $324,000 Bridge Loan Conversion & Their Ghost Payroll Scheme:**

  One part of the Dumanians' scheme involved stock fraud, loan fraud, and extortion regarding Schwartz's $324,000 bridge loans to Mesh in February and March of 2019, expressly conditioned on both founders' ability to re-borrow those funds back freely later from the Company at any time, even after conversion. (**Grp_Ex. I**) The Dumanians perjure themselves to cover up their scheme, denying that this was all previously approved at a lengthy four hour Board Meeting on February 23rd, 2019, convened by Dumanian in Dorado, Puerto Rico, and followed afterwards by a board dinner, with Randa present. (Id.) Critically, the Dumanian's own emails and Mesh's bank statements confirm that the February 23, 2019, Board meeting was specifically about this "**money**" the Founders were each advancing directly into Mesh's operating account as loans to bridge the company to FDA approval and the close of its Series A-2 round, contingent upon that approval. (Id.) Dumanian confirmed by email on February 28th that the board meeting held on February 23rd approved the "money" each advanced to bridge Mesh (Id.) And Mesh's banking records show that the founders wired nearly $300,000 each directly into Mesh's operating account in February and March 2019. Even before the board meeting, on February 15, 2019, those same banking records document and confirm that the "money" being advanced were bridge loans that could be freely re-borrowed back by either founder after conversion. (Id.)(Def.Ex.3)(See, initial

---

[12] The Dumanians needed each of these items in order to pursue their rogue fraudulent research and regulatory agenda, which neither Schwartz nor the Company's Chief of Quality and Regulatory Affairs, <u>Christopher Molina</u>, nor any other independent board member with prior public company life sciences experience would ever knowingly sanction or permit, so the Dumanians resorted to stock, loan, bank, & employment fraud, as well as extortion to extract board and shareholder control away from Schwartz.

wire transfer of $72,000 into Mesh's operating account on February 15, 2019 – 8 days *before* their

February 23rd Board Meeting – memo: "**BRIDGE LOAN CONV.**"

Stunningly, Dumanian commits perjury, flatly lying that the monies they each advanced to

bridge Mesh were loans: "*there was __no hint__ that those were loans.*" (D. Dep. pg. 85:12-13) and

"*the 286,000 that you're talking about was __never a loan__*" (Id. at pg. 86:8-9). Yet Dumanian admits

discussing Schwartz's personal financial cash flow issues on numerous occasions during early-mid

2019 (H.32:02-22), corroborated Schwartz's testimony that Mesh's Bylaws specifically provided

for such loans to company officers (H.173:17-19)(H.502:7-21) but lies that that the "money"

advanced to Mesh in February and March 2019 were bridge loans that could be freely re-borrowed

back after conversion (H.172:14-19;173:9-10), perjuriously testifying, he "*__never__*" discussed or

approved any loan to Schwartz: "*It was never a loan. We never talked about a loan…. We needed*

*to invest the money. That was part of the [founder's] agreement. And he got shares for them*."

(H.172:5-174:16)[13] [14] [15] – when the objective record evidence proves the opposite is true – and that

they met to discuss and approve the "**money**", "**bridge loan conv.**" and discussed Schwartz's

"**personal financial concerns**" (D.60-2 at¶13, D.58-3 at ¶9) at length during February & March

---

[13] Q. Didn't you agree that he could take a loan of his moneys that he loaned to the company back out when needed? A. No.  I disagree with your mischaracterization -- **no, that's too bad. There's no question, there's no time that any money put into the company was characterized as a loan,** and Mr. Schwartz, being a lawyer, should have papered that over Where is the piece of paper that that A-2 money was a loan? Didn't exist. It's his responsibility if he thought it was a loan. Well, **that's too bad.**" (G.Dep102:12-103:11)

[14] Did Mark Schwartz tell you that this money represented the last of  his savings? A. No. Q. You weren't aware of that? A. No. Q. Did he also tell you that he would only contribute that money into Mesh Suture if he could get it back later as a loan? A. No. But Dumanian admits otherwise in two Sworn Declarations: "Schwartz started to experience financial difficulties in 2019…. Schwartz discussed his personal financial concerns with me starting in the spring of 2019, and he continued to express concerns about his finances to me into the summer of 2019." (D.Dec.D.60-2,¶13)(D.58-3,¶9), and further admitted that Schwartz said he was running out of money in March 2019 (H.171:10-12)

[15] Q. So, your testimony today is that you were not aware that the money came into Mesh Suture from Mr. Schwartz as a loan; is that correct? A. Of course. Q. And your testimony is also that you had no understanding with Mr. Schwartz that he could later take that money out as a loan? A. **That is correct. I had no idea. And whole concept that he put the money in as a loan is a totally new concept that I have never heard before. I never heard that before**. (Id. at pg. 86:8-9).

2019, and given those "financial concerns" and problems with Randa (Grp_Ex. I)(Def. Ex.5) [16], it makes no logical sense that *either* founder would have agreed to convert otherwise <u>after</u> FDA denied approval March 15, 2019, and when their founders agreement did <u>not</u> obligate either of them *'to invest the money"* in 2019, because both Dumanian and Schwartz had already fully met their Series A funding obligation in Mesh's Series A-1 round which closed January 1, 2018.[17] Dumanian confirms the Board Meeting involved advancing "**money**" on February 28, 2019, in the same email chain as his notice of the Board Meeting itself which approved the founders' bridge loans. (Id.) Further, Mesh's banking records confirm that during February and March 2019 the founders wired nearly $300,000 each into Mesh's operating account. (Def. Ex.3) Mesh's bank statements confirm that Schwartz specifically noted and documented that the "money" they each advanced were bridge loans that could be freely re-borrowed by either founder, after conversion, doing so on the initial wire of $72,000 on February 15, 2019 – 8 days *before* the February 23rd Board Meeting – memorializing: "**BRIDGE LOAN CONV**" on the transfer itself. (Id.) Schwartz also testified that by March 5, 2019, he was threatening to quit as CEO and take his bridge loan money back due to issues Randa, (Def. Ex.5), but Dumanian convinced Schwartz to stay on as CEO. [18] [19] Schwartz

---

[16] Critically, it was at this same time that Schwartz discovered that Dumanain was writing the fraudulent Armenia study himself. To have leverage against Schwartz over what Schwartz knew about Armenia, after Schwartz threatened to quit as CEO on March 5, 2019, Randa Dumanian tried to frame Schwartz for loan fraud the next day, re: Joshuel Alomar, a security guard who had been hired only a few weeks earlier, <u>not</u> 1 year and 2 months earlier, as Randa's attempt to frame schwartz states, (Def. Ex.6) Critically, this was the same armed guard that Dumanian paid $2,000 in cash to oversee his armed takeover of Mesh's HQ and change its locks during Labor Day Weekend 2019. (Grp_Ex. I) Nor does Randa even deny she was trying to set Dr. Schwartz up for loan fraud in (Def. Ex. 6): "Q. Weren't you trying to set me for bank fraud with that document, Randa: A. **I don't think I need to set you up. You do plenty yourself**." (R. Dep 244:3-7)

[17] Schwartz testified that the founders agreement was fully performed and no longer applicable in March 2019, as both founders had already met their $360,000 minimum investment commitment to Mesh's Series A-1 round in January 2018. (H:289:15-25)

[18] Q. Did you specifically ask Mr. Schwartz at that time to stay and not leave the company? A. Yes. Q. And did you promise to get Randa in line and respect his authority as CEO? A. Yes. Q. Why did you ask Mr. Schwartz to stay? A. I thought at that point that it was in the best interests of the company. (H.168:15-24)

[19] Q. Did you specifically ask Dr. Schwartz not to quit and leave the company? A. Yes. Q. And why did you ask him to stay? A. Because I thought for the company to proceed, we couldn't have a change of leadership at that point. Q. Wasn't it also because Mark was doing a good job on behalf of the company? A."in March of 2019.. I still thought that .. he was the best person to remain in the helm of Mesh Suture." (G Dep pg. 95:11-96:8)

testified he "would have preferred not to buy any more shares in the company" (H.297:14) – and would only agree to stay on as CEO if Dumanian kept Randa in-line and would only agree to lead and support the round by converting his bridge loan into shares if he could freely re-borrow those funds back from <u>Mesh</u>, at any time [20] [21] [22]  But Dumanian's promises and assurances proved false, deceptive, and fraudulent – which Dumanian admits he and his family intentionally hid from Schwartz, **claiming they owed Schwartz "<u>No</u>" fiduciary duties of loyalty or honesty, whatsoever**.[23] (Grp_Ex. I)(G. Dep.Pg. 279-280)

Notably, it was at this same February 23rd Board meeting & dinner, Dumanian demanded to receive the same salary as Schwartz, despite a full time job elsewhere, and that he be paid a ghost

---

[20] Schwartz testified that FDA rejection was a huge problem for Mesh because it was trying to close its second financing round contingent on that approval "and were looking at either giving all the money back or folding up at that point… So, it was a very precarious position." Schwartz testified that in February and March 2019 Dumanian specifically agreed – at the board level - that if either of them converted their $324,000 bridge loans to shares, they could freely re-borrow those funds back from the company at any time:  saying "yeah, no problem" Q. Did he agree to it? A. Of course, yes, and at the board level because these were board-level decisions. .. there were a lot of decisions that we made with respect to that round." (H.298:16-24) and that it became critical for **both founders to participate in it**: "And I would say more critical for me. For I have raised a lot of money in my career, and ..nothing conveys confidence in an enterprise more than when a founder or a CEO is co-investing …, even though the CEO or the founder doesn't need that stock. So, -- in my position, had I pulled out -- that would have been the death of the company. If the CEO's leaving and taking his money out -- and I would have taken my money out of the corporate account because I hadn't committed to closing anything. We hadn't gotten there yet. This was before we closed the round. …But I said, look, I'm going to need this money back. ..I told him I'm going to have to take some of this money back in the form of a loan. He was fine with that-- we had put money into the operating account to bridge the company already. And now we're talking about, okay, are we converting this? And I said I can't convert this without --with no FDA approval now -- unless I can get this money back.  You're asking me to put the last of my savings in when I'm only doing it to show good faith for the investors.-- it wouldn't have been fair for me especially when I'm having trouble with, Mrs. Dumanian and we're having these literally major blow-up issues.")(H.295-296).

[21] "Q. Were there discussions about you taking a loan with Greg in 2019? A. **No. <u>I didn't take a loan with Greg</u>**. Greg and I both …shored up the company to the tune of almost $600,000 between February of 2019 and March 4th of 2019. And as a matter of fact, **I had just put the $250,000 into the operating account the same day I'm writing this e-mail to Greg that it's either her or me. So, if it's not me,  -- you know, my money is coming back**." (H.297:25-298:9)(Def. Ex. 5)

[22] "Again, the share purchase was conditional on my ability to take that same sum out secured by the shares in the form of a loan. The money came in as a loan; it was converted to shares to support the company; and, then, I did have the right to take that amount secured by those shares back as a loan if I needed it." (H.455:1-6) Q. And did you specifically have a conversation with Greg in March of 2019 where you advised him that you would only put in the money if you could take it back as a loan? A. Of course. (H.296:16-20)

[23] "Q. Do you think you had a duty of honesty and fair dealing with me in communications as a fellow board member, as a partner in the company, as a shareholder, as the CEO of the company? Do you think you owed me any duties of loyalty -- any fiduciary duties that required you, to honor your promises to me or let me know that someone is actively undermining me, when I was told you would keep her in line. A. **No**." (D. Dep. Pg. 279-280) Q. "Was it okay with you that she was undermining me behind the scenes, and you never told me? A. **Yes**. (Id. at 277:16-21) Q. "So he, [Adom] didn't have any truthful and honest communication with me either, correct? A. **Correct**. (Id. at 286:2-5) Q. "**Did you tell me …that Randa wanted to Fuck us all? Q. A. No. Q. Why? A. <u>I'm in agreement with her</u>** .." **(Id. at 289:11-21)**

parolee via Randa, making her Mesh's highest salaried employee at $460,000 which Schwartz approved at the meeting as "the only way to keep the peace" (H.285:3-286:18). Randa commits perjury at trial, denying she was party to discussions re: Schwartz's loan, when she was present both on February 23rd and at the next board meeting held in Las Vegas in March, and also denying awareness, either then or now, that she had the highest salary at Mesh, (H.578:11-23)(Def. Ex. 9)[24]

Dumanian admits he and Schwartz were "constantly in dispute" over "inflated salaries" but without evidence, lies that the dispute was over "*his* concerns" about "inflated salaries" because "*Schwartz* was using" Mesh's funds "to enrich himself and his family",[25] rather than *Schwartz's* concerns about Dumanian's $340,000 ghost payroll salary,[26] which, after Dumanian's 2nd extortion attempt, Schwartz went on record on August 23rd, to officially document that he could no longer support or objectively defend. (Grp_Ex. I)(Def. Ex.14).[27]

---

[24] Q. Were you a party to any conversations between Greg and Mark about Mark taking a loan after he put money into the company in the A-2 round? A. **I was not**. Q. You were the highest paid employee at Mesh Suture while Mark was CEO; is that correct? A. **I was not at the time, nor am I now, aware of that fact**."(H.578:11-23) But see (Def. Ex. 9) confirming the exact opposite awareness: **"But I have highest salary (which is actually Greg's) so i'm shutting up"** and at her deposition "I believe it was understood that part of my compensation was for Greg ..." (R. Dep. Pg.239)

[25]"After the March 2019 financing, ..there was constantly a dispute between Schwartz and me as to the amount of the salaries because I felt Schwartz was using the Series A investors' funds to enrich himself and his family. **I always had concerns with inflated salaries being paid to Mesh Suture employees**" D. Dec. ¶11 (D.60-2)

[26] Q. you think that I agreed to pay your wife more than me because you, a founding shareholder, who was working somewhere else, making a million dollars a year, should get paid as a ghost employee of Mesh Suture? Q. Are you saying seriously that I agreed with that? A. No, I think that you were pushing back against it." (G. D. Dep. Pg. 312:5-17) "Q. Why didn't you take your salary in your own name? Why were you being ghost payrolled for Randa? A. "...I thought it was a reasonable plan. And you agreed with it." Q. So you're saying that I agreed that Randa would receive ghost payroll for you .. when you weren't working for the company full time-- at most, eight hours a week? A.".my contributions, even at eight hours.. I was and still am the most important person at Mesh Suture.., even if the hours that you're trying to hold me somehow seem numerically less than others." (Id. at 279:22-281:11)

[27] "Greg- I write this calmly and clearly to you because it is necessary in the hopes that we can rise above another hiccup between friends and business partners as we both try to make this legacy scale and eventually survive us both. So please take everything I am about to say in the true spirit of friendship and good counsel in which it is meant. …This is also meant to address the founders and control issues which overshadowed and interfered with Monday's Board meeting.  We also knew that as soon as the Company took money from outside investors, it would no longer be just the Mark and Greg show. Regrettably, for quite some time, I have continued to see two major obstacles to becoming a real company, and institutionally investible, as you know, and after the shouting match we got into last night, I cannot remain silent and off the record any longer. With all my hats on, I need to document my disagreement with you and make a record: **1. First and foremost, the Board needs to become independent**. I was extremely disappointed that you rejected my right as CEO, and under our Corporate Bylaws to name a qualified, independent person, Chris Molina…What was even more disappointing is  that by attempting to condition both his appointment (which is my right as CEO under our Bylaws) and your sign-off on my long planned distribution in exchange for an agreement wherein I would need agree to vote as you specify on all shareholder matters going forward, you,… were not acting in the best interests of the Board, the Company, ..Series A Shareholders, ..your fellow Co-Founding shareholder, and your close personal friend. .. **2. Second, compensation needs to be**

**II. Dumanian's Perjury Re: The August 19th Board Meeting, Attempted Extortion of Schwartz and Fraudulent Concealment of their Agenda Re Armenia (Grp_Ex. J):**

Unbelievably, Dumanian testified that *the first time* he heard about Schwartz's $324,000 loan was at dinner the night before the August 19th Board Meeting, [28] notwithstanding that he was **not only** aware of the loan and its prior approval at two official board meetings and dinners held in February and March 2019, [29] he was **also aware** of the exact day -August 23rd- Schwartz planned to fund it [30]

Incredibly, Dumanian also commits perjury claiming the subject of the loan was "**never discussed**" at the Board Meeting, notwithstanding the detailed list of extortion demands that Randa was emailing him both during the Board Meeting itself (Def. Ex. 12) and afterwards (Def. Ex. 16) and notwithstanding Dumanian's emailed demand for Schwartz's login and password at Wells for the *first time ever* on August 17th (H.34:21-24) just before that dinner and board meeting (Grp_Ex. J) and notwithstanding the fact that Dumanian was already planning to extort shareholder and board control away from Schwartz by reneging on the previously board-approved loan, and demanding that Schwartz must either sell his shares to Dumanian, or accede to the Dumanians' other

---

objective and fair. This is important for investors, alignment, and company culture. We share the **exact same concerns** about the need to conserve our cash and extend the Company's runway for as long as possible... If we, the Board, is going to do what's right for the Company, its employees, and its shareholders, **compensation needs to be objective and fair**. And in my extremely strong opinion it needs to be revisited and addressed, immediately…And the issue is not about my comp at all, **it's about yours** and which I kept silent on for a long time. …Comp. is for full time employees who are working here, full time, exclusively for Mesh. You have another full time job. If we truly share the exact same concerns about the need to conserve Company cash and extend the Company's runway for as long as possible, especially post-rejection, you will agree to address this fix these terrible optics. …I am here every day. You are not. And Randa isn't you. **I can't objectively defend this**." (Def. Ex. 14)

[28] On the night before the August Board Meeting, ..Schwartz demanded a loan from Mesh Suture for $324,000. **I refused, agreeing instead to buy back Schwartz's investment** in the Series A-2 round of Mesh Suture... (D. Dec. D. 58-3,¶12)( D.Dec.D.60-2, ¶15)

[29] Schwartz testified: "We were always on the same page with the loan. There was never any problem till he decided to change his mind with that in August" (H.345:17-18)

[30] "Q: Was there a time where you needed to take the loan? A. I had been telling him. I had already postponed it since June. And he knew we were going to get to a board meeting and going to do all that. I said I need written approval. And I have to do it, Greg, because I'm running out of money. And the thing is that he was putting up barriers." (H.300:2-15) I wasn't asking him to take it. I was just saying I'm going to be taking it. And naturally what he said was, well, -- I'd like to see that the company really doesn't need the money. So, what we did is we prepared -- for the board -- a runway … And I showed that the company didn't need the money and had plenty of operating runway…, and it didn't matter that that money was there or not. (H.301:10-19)

12

enumerated demands listed in (Def. Exs. 12 & 16) in exchange for the return of his $324,000.[31] (Grp_Ex. J). Dumanian's reasons for doing so had nothing to do with the company and were strictly personal.  ("**I don't want you to get a loan**")(H.35:20-36:7).  It is also clear from Dumanian's testimony that the only one intent on holding the other's money hostage to obtain personal advantage, was Dumanian, who clearly understood the $324,000 he was using as financial leverage to extort board and shareholder concessions was *Schwartz's "money"*. [32]

Critically, Dumanain committed perjury <u>three times</u> at trial by falsely swearing that the subject of Schwartz's loan was "**never discussed**" at the August 19th Board Meeting, (H33:18-24:3)(H35:3-6) and committed perjury about this at his deposition (D. Dep pg., 295:11-299:20)(See Grp_Ex. J).[33]  But the objective record evidence proves Dumanian is lying. In fact, Dumanian spent nearly two hours attempting to extort Schwartz during the August 19th  2019 Board Meeting [34] while Randa Dumanian was in an adjacent room on the phone with their *own* <u>independent corporate</u>

---

[31] "In August 2019, Dumanian indicated that he intended to renege on his previous agreement regarding my loan from Mesh and which I had relied on when I invested the $324,000 in Mesh's second financing round. At a Board meeting on Monday, August 19, 2019, I advised Dumanian that the $324,000 loan would fund before the end of the week. Suddenly intent on securing shareholder voting control over me, Dumanian now insisted, for the first time, that I must either cancel my shares outright, sell them to him, or, if I still wanted a loan, I would have to pledge voting control of my shares to him in perpetuity, until I paid the loan back to Mesh, in order for him to sign off on it. I insisted that he had already signed off on it at the board-level, back in March 2019, that I was not amenable to the addition of his new terms and conditions, and I did not appreciate that type of selfish and underhanded behavior from a friend and co-founder, and fellow board member, and that I intended to fund the loan as planned, later in the week.

[32] "So, you don't get to get *your money* and the shares at the same time. I said, you can't have *your money* and your shares, too. It's either, you know, you have the money and then you give back your shares or I buy your shares or -- you can't have both ends of it. (H.33:13-16)(See also, Pl. Ex. 5, text on 8/22)(GD - "Yes, it's about shareholder stuff and about *your money*.)

[33] "Q. Did that issue, as far as you can recall, come up during the board meeting? A. **No**. Q. Were there ever any board minutes signed related to the August 19 board meeting? A. There were no signed minutes because Mr. **Schwartz had added a line or two about the $324,000 that the board approved him taking it back**. And that is not what we had agreed upon. **We didn't even discuss it**. So, I wouldn't sign those minutes." (H.33:20-34:3)

[34] Schwartz testified that despite approving the loan from the company on behalf of the company at the board level back in February and March of 2019, Dumanian tried to unreasonable impose conditions on it later: "So, the conditions were purely personal conditions. In other words, instead of thinking about what was best for the company, he wanted to use the leverage that he had over me supposedly that I wanted him to, you know, write something down that this is approved by the company, all our financing, everything. -- he either wanted to buy my shares personally or he was insisting that I pledge voting control, not just over those shares, but over all of my shares at the company, to him….**This is what we spent -- we spent two -- Greg and I spent two-and-a-half hours in the board meeting not just talking about this, but getting into words over trying to extort a partner -- a business partner -- trying to use his financial leverage over me -- that written approval -- to gain personal advantage. I said this is not best interest of the company, and it's not fair to me. And that was a wake-up call for me**."(H.301-302)

attorney for the meeting, who was sending email messages containing their list of extortion demands to Dumanian during the meeting (G. Dep. 295:11-296:16) (Id.)[35] [36]

However, Randa's trial testimony confirms that the subject of the **loan was discussed** at the August 19th Board Meeting (H.557:13-25), as do (Def. Exs. 97, 12, 16, 136-AL) , as does (Pl. Ex. 44)(Grp_Ex. J). Moreover, Dumanian himself admits the loan was discussed at the Board Meeting in two sworn declarations stating: "Schwartz was upset that the Board had resolved to buy back his shares in lieu of a loan of approximately $324,000" (D.58-3,¶13)(D.60-2, ¶17) [37] Critically, how could the Board have "resolved" this if the subject of loan of $324,000 was "**never discussed**" at the board meeting as Dumanian falsely claimed at trial (H33:18-24:3)(H35:3-6) and in his deposition (G.Dep.pg.,295:11-299:20), proving Dumanian committed perjury to deny his extortion and criminal breaches of fiduciary duty at an official corporate board meeting. (Grp_Ex. J)

## III. The Dumanians' Perjury Re: Their Attempted Extortion Of Schwartz On August 22nd (Grp_Ex. K):

In fact, as noted above, Dumanian tried to extort Schwartz over the return of *his* Mesh bridge loan "money" twice, once at the August 19th board meeting, and again via text and over the phone

---

[35] "In August 2019, Dumanian indicated that he intended to renege on his previous agreement regarding my loan from Mesh and which I had relied on when I invested the $324,000 in Mesh's second financing round. **At a Board meeting on Monday, August 19, 2019, I advised Dumanian that the $324,000 loan would fund before the end of the week.** Suddenly intent on securing shareholder voting control over me, Dumanian now insisted, **for the first time**, that I must either cancel my shares outright, sell them to him, or, if I still wanted a loan, I would have to pledge voting control of my shares to him in perpetuity, until I paid the loan back to Mesh, in order for him to sign off on it. I insisted that he had already signed off on it at the board-level, back in March 2019, that I was not amenable to the addition of his new terms and conditions, and I did not appreciate that type of selfish and underhanded behavior from a friend and co-founder, and fellow board member, but that I intended to fund the loan as planned, later in the week. Later that same evening Dumanian e-mailed me noting the "positive" Board meeting and to "bless" the payment as a share cancellation. (Ex. 13)(Def Ex. 130, S. Aff. ¶13), which Schwartz agreed to do (Def. Ex. 11A)

[36] Dumanian perjures himself about having independent counsel as well, "I insisted on independent corporate counsel to evaluate options and present to the Board a plan to potentially assist Schwartz, **but because independent corporate counsel was never involved**, I did not approve any transaction involving Schwartz's Series A investment. (D. Dec. D.60-2 ¶16)(D. Dec. D.125-4, ¶15) Yet, at his discovery deposition, Dumanian confirms he had his **own** corporate counsel available by phone and email during the meeting – far better to serve his interests, alone, than any "independent" counsel would be.

[37] Schwartz was upset that **the Board had resolved to buy back his shares in lieu of a loan of approximately $324,000.**. he became aggressive to the point that he sought to intimidate me by text and by telephone on August 22, 2019, and he retaliated against my family and me by blocking our access to Company email and other Company information. (D.58-3,¶13)(D.60-2, ¶17)

on August 22nd (Grp_Ex. K) – In fact, Dumanian was so "*worried about the money*" (G. Dep. 306:24-307:2) which was Schwartz's, *not his*, that Dumanian took measures to preemptively disable Schwartz's email (Def.Ex.137) (<u>2:49pm</u>) (mark.schwartz@meshsuture.com, Email Password Reset Notification) and suspend Schwartz's online banking access (Def. Ex.138)(<u>4:45pm</u>)("Your Wells Fargo Online access has been suspended") to block Schwartz from funding any disbursement – *even as a cancellation* – *just before* Dumanian he contacted Schwartz by text (Def. Ex. 139)(<u>5:26pm</u>)("Have time in 20-30 min for a quick call?") and then again by text at (Id.)(<u>8:38pm</u>) confirming ("Yes, it's about shareholders stuff and <u>*your*</u> money. We can talk this weekend as long as there isn't any movement on the money front until we talk") and then called Schwartz and proceeded to attempt to extort Schwartz into surrendering his board appointment right as CEO *in addition* to cancelling his shares, otherwise Dumanian would not authorize the return of <u>*Schwartz's*</u> "money". [38] [39] Dumanian thoroughly perjures himself about this as well. Falsely swearing by declaration and in his fraudulent complaint that: "I did not approve any transaction involving Schwartz's Series A investment."[40] when both (Def.Ex.13)("<u>I will bless you canceling the shares</u>", to which Schwartz replies, <u>Thank You!</u>) and his unsolicited admission during the call on September 3, 2019 (Def. Ex 40)("and then we never even got to your $360,000 dollar ask… <u>Which I said, "Yeah, let's do it</u>, but let's do it the right way." (Def.Ex.40, Rec. at 13:31, Tr. at 9:1-

---

[38] Dumanian's spun trial testimony reverses the order of events on August 22, "*when he was calling me and abusive on the phone and I was worried about him taking money from the Mesh Suture account, that really started getting me thinking.* (H.178:3-5), to suggest that Dumanian's worry was due to Schwartz's "abusive tests" and subsequent unanswered attempts to speak with Dumanian after discovering that Dumanian had disabled his email and suspended his Wells online bank access earlier that day.

[39] Yet Randa's trial testimony, diary, and timeline (Def. Ex. 97) all confirm that Schwartz had already agreed to cancel: A. <u>August 22, text and verbal abuse and hammer calling until midnight</u> to Greg, <u>when Greg by text tells Schwartz not to take out money.</u> H.555:24-556:2) (Def. Ex. 97) "Mark hammer calling me and Adom until after midnight last night after explosive phone call with Greg regarding <u>Mark cancelling his shares and to take back *his* money.</u>" (526:9-14) "Q. And what did you mean when you indicated Mark was belligerent, abusive to Greg and threatening? A. <u>Mark was not having any of what Greg was proposing.</u> He used expletives. He threatened Greg. He was angry and abusive." (H.527:6-15) – But as confirmed by Def. Ex. 139, the argument was not either the loan or share cancellation, but rather pertained to Schwartz's board designation rights as CEO, specifically referencing, Chris Molina – rights which Dumanian was trying to force Schwartz to surrender to get **his** money back.

[40] See, (D.Dec,D.60-2,¶16)(D.125-4,¶15)(D.Am.C.,D.16,¶56)

7) Moreover, how is this not approval? Together this mountain of objective record evidence including (Def. Exs. 12, 16, & 139-142) and (Pl. Exs. 5, 55, & 62) prove Dumanian's testimony fraudulent, false, and perjured. (Grp._Ex.K) Dumanian further swears "I never agreed to Schwartz's removal of $324,000 from the Account' (Dum.Decl.¶19, D.60-2), but once Dumanian blessed the cancellation (Def. Ex. 13) and Schwartz agreed to it (Def. Exs. 11A & 144) it is up to Dumanian to explain why Schwartz, the CEO, would need any further permission or approval from him to disburse funds from a corporate account where Schwartz was sole signatory, and, incontrovertibly still CEO.[41] Conversely, it is also up to Dumanian to explain what corporate authority he had, as CTO, to take secret, unilateral, extra-corporate ultra vires personal action to pre-emptively disable the CEO and Board Chairman's email and suspend his online banking access to prevent it, even absent the extortive reason he did so, purpose, then, to falsely spin it to accuse Schwartz of impropriety for attempting to re-gain that access.

After Schwartz discovered later that evening that Dumanian had disabled his email and bank access, Schwartz tried unsuccessfully to reach Dumanian by phone at 9:49pm CST, 10:32pm CST, & 10:42pm CST (Def. Ex.140), and by text at 10:42pm CST, writing, "Greg, I am seriously concerned" (Def. Ex.139). By 11:48 pm EST. With Leo's assistance, Schwartz was able to restore his corporate email and online banking access at Wells at 11:48pm EST(Def. Ex.141) and thereafter, funded the disbursement at 11:49pm EST (Def. Ex. 142).[42]

---

[41] "A. **In no way was I giving my approval for him taking money out of the Mesh Suture bank account**. Q. Why not? A. Well, my primary concern was that I didn't think it was right, that he had both his shares and the money. Number two, I had insisted even four or five days earlier when we were having dinner together that we have outside counsel look for transparency purposes at all the documents." (H.54:15-24) This testimony is also perjured, as the evidence proves Schwartz agreed to cancel and emailed Dumanian minutes to that effect, prior to Dumanian's extortion attempt, so Schwartz wasn't getting "both his shares and the money", Dumanian had his own corporate counsel for the meeting, (G Dep pg. P.295:11-299:20) nor were there any "documents" involved in a cancellation – only noting it on the company's books & shareholder roster, and writing "cancelled" on the certificate.

[42] So "he texts me, like, the day I'm taking -- you know, the day he knows -- I mean, I told him forever Friday the 23rd -- so, he's texting me, don't take the money. I said, Greg, this was done months ago. We're not doing this now. If you wanted to get independent – that never was mentioned, by the way. This nonsense about getting independent people to look at it. We didn't need that. ..I said

Dumanian and Randa both commit perjury to falsely spin the events on August 22nd in their favor and against Schwartz: In his perjured Declaration and fraudulent complaint Dumanian falsely attests: "Schwartz was upset that the Board had resolved to buy back his shares in lieu of a loan of approximately $324,000, and *he became aggressive to the point that he sought to intimidate me by text and by telephone on August 22, 2019*, and he retaliated against my family and me by blocking our access to Company email and other Company information such as vital science and regulatory databases." (D.Dec.D.58-3,¶13)(D.Dec.D.60-2,¶17) "*Schwartz became increasingly volatile after the August Board Meeting due to my reluctance to grant him a large Company loan*. On August 22, 2019, Schwartz sent a series of profane texts and attempted to call me on multiple occasions *in anger regarding the issue of the loan that I did not approve*.(D.Dec.125-4 ¶17). " "Schwartz was upset that *the Board had resolved to buy back his shares in lieu of a loan of approximately $324,000, and he retaliated against Plaintiffs by verbally abusing Dr. Dumanian on a phone call that occurred on August 22, 2019, and by blocking Plaintiffs' access to Company email and other Company Information such as vital science and regulatory databases*." (D.Am.Comp.,D.16,¶57)[43] The

---

this is not best interest of the company, and it's not fair to me. And that was a wake-up call for me. Then I realized -- if he won't get us to where we can sign off on minutes, I'm going to need to make a record of what all that's going on because I'm trying to clean it up. Q. You took the loan -- the $324,000 loan -- is that correct? A. yes. Q. And Greg was irate about that; is that fair? A. No, he wasn't. He -- actually, no. No. ..Because --- he knew it was coming. I mean, this was not something at the time that he even objected to. He just wanted to hold it over me and gain leverage. And I said, you know, Greg, we've done a lot of things for a long time, but I'm taking it as a loan. I'm documenting it as a loan. If you want to claim it's something else some other time, we can fight about it some other time. But I'm not letting a partner pull shenanigans on me like that. I just didn't think it was appropriate. Q. During the course of this litigation, Dr. Dumanian has accused you of stealing that money; is that correct? A. Stealing my own money, you mean? Q. At some point., you decided to do a share cancellation? A. I did. Q. And why did you do that? A. Because ..he blessed it as a cancellation and ..he blessed that. Let's leave it alone. It's cancelled. The point of it is, … talk about fraud. The money came in and … was promised to me back as a loan by my partner, by a fiduciary, my fellow board member. And if he decides later on that he's not going to honor that, well, I don't think I need to honor that investment in the company. I think  -- the company got that investment through a fraudulent representation to me. And, so, whether it's a cancellation or a loan, this Court can decide. I'm okay either way. And I just figured it's simpler at that point after I know we're never getting back together -- I did in April of 2020, So, I waited… And I figured we're never getting back together; this company is over. What am I messing around for here? I didn't want these shares to begin with." (H.202-304)

[43] Notably, as discussed below, vital science and regulatory databases and company information the Dumanians are duplicitously complaining that Schwartz disabled their access to overnight, is the same information and vital science and regulatory databases the Dumanians had long been sequestering and concealing from Schwartz and the Company had "no access" to, and which the Dumanians intended to use as leverage to compel Schwartz and the Board to approve their illicit plans re Armenia(DefEx136-AL).

Dumanian's also leverage their spun, perjured story to falsely accuse Schwartz of theft, embezzlement, and misappropriation of funds (D.Dec.60-2,¶18) [44] and as a result of these and the Dumanians' other invented claims furthered by perjury, Schwartz now finds himself the subject of a criminal indictment. [45] Further, (Pl Ex. 44), penned by Randa herself, confirms their emails were disabled *only* overnight, "Between 10pm Thursday August 22 and 8am Friday August 23") and as such none of the Dumanians were "shackled", "paralyzed" or unable to work, as Randa falsely attested at trial,[46] [47] nor did Schwartz repeatedly "hammer call" until past midnight – rather, Plaintiffs own (Pl. Ex. 55) confirms that the last of Schwartz's three call attempts was placed at 10:42pm CST – *not* past midnight – Showing that the Dumanians will lie and perjure themselves even on minor/background issues to lie and conceal the truth. Dumanian also falsely swears "*Schwartz <u>did not disclose to the Series A Investors or to me that he took $324,000 from the Account</u>, and he <u>never provided documentation</u> of the purported terms of this transfer to any Company official*" (D.Dec.D.58-3,¶14) (D.Dec.D.60-2,¶19) when (Def. Exs.93,171) prove

---

[44] A. "**I am classifying it as a theft because <u>he had no authority</u>** to remove $324,000 from the Mesh Suture bank account and to put it in his own personal bank account. **That's theft.** " Q. And you're taking that position because you wanted him to cancel the shares versus taking the money as a loan, correct? A. I wanted whatever was going to happen to be blessed by independent counsel. Save for that, I was not giving **my approval for him to take money out of the Mesh Suture bank account**. (H.171:2-175:13)

[45] Randa Dumanian also swore out and filed a false criminal complaint against Schwartz in Puerto Rico, just four weeks after filing this case, falsely accusing Schwartz of these same crimes, which critically also localized the "extortion" to the call on September 3rd (Grp._Ex. K)(Def. Ex. 66) , which at the hearing, Dumanian attempted to walk back from at the hearing, suddenly changing the date of the extortion to the 4th, three years later, when his Complaint filed just weeks after the events, falsely and repeatedly claims otherwise.

[46] Q. What impact did it have on you and the company for you and Dr. Dumanian and Adom to be locked out of all the company accounts on August 23rd? A. Well, this move shackled us. We were shackled. We could not work. Paralyzed. 527:17-528:12), but this too is false, as shown by (Pl. Ex. 55), the IT disruption was only overnight. Further Leo Schwartz confirmed "I locked their accounts on the 22nd and restored them in the morning on the 23rd" after "I was advised  they were threatening company assets." (H.722:18-19)(H.725:22-23).

[47] Schwartz testified "Leo Schwartz, … deactivated them on either the 22nd or 23rd because what was happening was they were already tampering with the bank account at that time. I was getting locked out. **Randa Dumanian had access to the login passwords of all the accounts as far as I knew**. on August 22nd or August 23rd, …the Dumanians were trying to hit the bank accounts, and we were getting deactivated, and I didn't trust what they were doing. And I said you better just deactivate them until we figure out --what they're doing, what they're up to -- they were actually locking me out of <u>both</u> the Mesh Suture Wells account and the Banesco account. (M. Dep. ppg. 83, 95:4-96:12)

otherwise.  Critically, there is little truth to be found in any of the Dumanians' testimony in this case, especially when they are willing to perjure themselves on even the most minor details to support their fictitious narrative that they are hapless victims of a takeover scheme[48], rather than its perpetrators.

## IV.  Schwartz Goes On Record To Document His Concerns And Address Numerous Longstanding Corporate Governance And Housekeeping Matters (Grp._Ex K)

Schwartz testified that these events were a real "wake up call" for him and left him with no other choice but to go on the record to document his concerns and so did on August 23rd (Def. Ex. 14)[49], Sept. 1st (Def Ex. 26)[50] & Sept. 2nd (Def Ex.37)[51]. (Grp._Ex. K) Such actions by a partner, friend, and board member were a complete violation of trust and criminal breach of fiduciary duty. Dumanian's two extortion attempts, deactivation of his email and banking credentials, and refusal to sign corporate board minutes, left Schwartz as a corporate fiduciary himself, no other choice but to go on record to formally document his concerns on August 23 and begin to address numerous longstanding corporate governance and housekeeping matters which Dumanian, by his refusal to sign minutes, was intentionally interfering with for his own personal benefit,[52] such as overhauling

---

[48] "I knew it was a horrible, horrible thing that was happening to me and my family, but I had no choice." (H.102:7-9)

[49] "What was even more disappointing to me both personally and professionally was that by attempting to condition both his appointment (which is my right as CEO under our Bylaws) and your sign-off on my long planned distribution in exchange for an agreement wherein I would need agree to vote as you specify on all shareholder matters going forward, you, personally, were not acting in the best interests of the Board, the Company, and the Independent Series A Shareholders, not to mention your fellow Co-Founding shareholder, and your close personal friend." (Def. Ex. 14)

[50] "That Board Meeting failed after you unilaterally, without legal justification, or authority refused my right as CEO, under our bylaws, to appoint an independent, industry qualified representative, Chris Molina, to our Board, and also bless a planned distribution that I had full authority to do, unless I would submit to enter into an side letter agreement giving you irrevocable proxy power to vote my Founders shares in perpetuity– Go ask a lawyer, that's attempted theft and extortion my friend! I will not be subjected to criminal abuse. (Def. Ex. 26)

[51] "His actions include but are not limited to the following: 4. Attempting to extort me into relinquishing voting power to him in perpetuity." …He only retaliated against me and discharged me after I brought these other matters to light and told him that I wouldn't help him further subjugate stakeholders interests or permit him to extort or threaten me." (Def Ex.37)

[52] "I did it because what I found out at the August 19th board meeting  was -- self-dealing people who didn't care about anybody's interest, either mine or the other investors. They were only out for themselves, and I was not going to be a party to that any longer. Once I realized the levels to which they were going to go, I wasn't playing ball. I was going to clean this company up -- and I was

all company employment contracts, (Id.)(Def. Ex.22), reviewing an addressing compensation company-wide for fairness (Id.)(Def. Ex. 18), shutting down Dumanian's rampant ghost payroll scheme in its entirety , which also Dumanian's daughter Zari, who had no involvement at Mesh whatsoever[53] (Id.) (Def.Ex.20, appointing himself an emergency interim Series A representative to give the unrepresented Series-A shareholder interests an interim voice on the board until an official election could be held (Id.)(Def. Ex. 19), and convening a video-taped corporate culture meeting on August 26th to improve employee morale and foster alignment towards a shared mission and goal. (Def. Ex. 162)

**V.** **Meanwhile, The Dumanians Continued To Conceal Plan and Plot To Takeover Mesh As Well as Their Activities, Data And Plans Re: Armenia From Schwartz, The Company, And It's Board (Grp_Ex. A & B)**

Meanwhile, Schwartz and the Company were still completely ignorant of the Dumanians' plan and plot to takeover Mesh as well as concealed activities and agenda re: Armenia, which the Dumanian's had concealed and sequestered from Schwartz, the Company, and its Board (Def. Ex. 136-AL). Critically, during the August 11th September 5th timeframe during their claimed *duress*, the Dumanians were not only and trying to extort board and shareholder control away from Schwartz, they were also actively engaged in planning and plotting to take control of Mesh Suture ("Mesh") to "Fuck the Schwartz's" (Grp_Ex.A) and use Dumanain's fraudulent Armenia data to obtain approval as a suture (Grp_Ex. B) – a rogue personal scheme they hid from Schwartz, the Company, and its Board, before, during, and after purportedly settling the dispute, concealing both

---

[53] going to drag them kicking and screaming if I had to do it. And once we got it cleaned up, we put independent people on that would basically solve the problems because I didn't want to manage them anymore. I wanted to step away from the company at that point. I don't need to work for people who are so duplicitous, and I don't work with people who are not good partners. Okay? And once I found out that's what they were doing and then it became very clear to me that's what they were doing, I wasn't having it anymore. I was going to go on record. I was going to make sure that investors were protected. I'm going to make sure that there's nobody taking an excessive salary, and I'm going to make sure that all -- the crap is cleaned up because I've got liability too." (M. Dep pg. 112:6-113:11)

[53] Q. Is Zari involved with Mesh Suture in any way? A. **She is not**. (H.519:3-5)

the Armenia Trial Data, their ongoing involvement, and their rogue personal agenda and plan to use it from Schwartz, the company and its board, while misrepresenting the status of the clinical trial at Walter Reed, needed for approval as a mesh.[54] (Id.)

After Schwartz refused to succumb to Dumanian's two extortion attempts, the Dumanians began planed, plotted, and then carried out a covert, illegal takeover of the Mesh's assets and bank accounts, including an armed attack on company assets and personnel, over Labor Day weekend in 2019. On August, 25th, after their attempt to extort Schwartz on August 19th and 22nd, failed, the Dumanians accelerated their takeover plans emailing oneanother about their "**Vulnerabilities**" including "**Logins and passwords, Wells Fargo, Meshsuture email**")(Def. Ex. 15)(Id.) , their plans to oust Schwartz to prevent him from appointing a board member as CEO (Def. 16)(Id) , counting shares in anticipation of a proxy battle, and critically, corporate banking resolutions they had since April 2018 ("**FTS_board resolution for opening accounts**", to which, Dumanian replies: "It's a start") (Def. Ex. 21)(Id.)  as well as many others similarly labeled "FTS", Randa's abbreviation for Fuck the Schwartz's, including Randa's **"FTS_CALL LIST.docx"** [55] (Def. Ex. 24)(Id.)  email to Dumanian and Adom on August 31st detailing each step they planned to "**take the money**" by seizing control of Mesh's corporate accounts at Wells Fargo and HSBC.

Critically, it was the Dumanians' Plan B – to "take the money" at Wells Fargo, formulated and carried out after their attempts to extort board and shareholder control from Schwartz, failed. Critically, this was the Dumanians plan - not Schwartz's, discussed infra.  This evidence squarely

---

[54] Authoring and backdating IEC approval, paying bribes to Wigmore, the PI and IEC Chair, performing surgery on study patients, and fabricating data, as set forth in D's Inj. Mot. (D. 189) and (Grp._Ex. B) herein

[55] "Randa signing off. Done enough damage for one day. "Greg and Adom: PLEASE read carefully and add to these preliminary lists." 3. WELLS FARGO - "DECISION AND ACTION" Randa-In person OR call? To safeguard shareholder funds. AIR, HOTEL, CAR Randa FLY MONDAY TO DENVER, RENT CAR, SLEEP IN EDWARDS. WAIT AT BANK DOOR 8:30AM Tuesday, BRING: employment contract Randa COO, employment contract Mr. Schwartz.., Greg Resolution firing Mr. Schwartz, ZARI Mesh Check; 4. HSBC: Randa: CALL at 7PM Chi time HSBC Hong Kong, Randa PIN 487992, BUSINESS INTEGRATED ACCOUNT Signatories Mark Schwartz, Yajia Hu, Randa Dumanian,Winona.c.h.ng@hsbc.com.hk)(Def. Ex. 24)(Id.)

confirms that the Dumanians planned to take the money to hijack control of the Company, not Schwartz.[56] (Id.) Their motive was to use Dumanian's fraudulent Armenia research by any means necessary, including extortion – that part of their extortion scheme involved their "Strategy" to hide the Armenia data and their plans to submit it to regulatory agencies for approval as a suture secret from Schwartz and the Board as "Our one point of leverage" (Def. Ex 136 AL) (Grp_Ex.B).

The also hid and concealed their ongoing fraud in connection with the Armenia study itself, For example, on August 11, 2019, one day before Randa's "Fuck them all, Greg, you need to step up to the plate" email (Id)(Def. Ex. 10) Dumanian emails the supposedly independent PI and IEC Chair asking them to backdate and invent a fictitious control group with the same patient reported outcome as the study group to submit to the US FDA, writing "Davit, I thought it would help you to see the first 15 patients that *we will need to match somehow*. We need a control group of 15 patients with matched procedures that did not have Duramesh to have the *same patient reported outcomes*". Critically, on August 20th, just one day after the August 19th Board meeting, Dumanain emails the PI again: "Garen - *Not to put any pressure on you, but the entire company rests on completing this data acquisition. I had no idea that your surgeries would become the cornerstone of the safety and efficacy information given to the FDA and European Union*."(Id.)

Yet the Dumanians' official A&S Report at the August 19th Board Meeting communicates **none** of this information. (Def.Ex.11-B)(Id.) Tellingly, the Dumanians' Board report mentions Armenia only **once**, in a single sentence,[57] while fraudulently representing "Walter Reed is on track" when the Dumanians already knew it had been cancelled/postponed indefinitely. (Id.)

---

[56] There is no evidence any of the Defendants felt similarly or were similarly plotting in advance to "take the money" or take over the company.

[57] "We were able to resolve discrepancies in the Armenia Clinical Trial data perceived by Dr. Gibeily and will not be required to address these in the new 510k submission" (Def. Ex. 11-B)(Id.)

Similarly, Randa's August 22nd budget details and lists 13 separate A&S activities – but is silent re: Armenia.  It is not even listed as an A&S activity. (Def. Ex. 144)(Id.)

Yet compare the Dumanians' fraudulent A&S report they presented at the  August 19th board meeting against their Science Update to Crosson in November, several weeks later. (Def. Ex. 136-AM)(Grp._Ex. B, pg. 116-126).  Suddenly, Walter Reed has gone "M.I.A" – it's not mentioned at all – not even once. But wait, what's this??? ….Since when did Armenia become "**The centerpiece of our regulatory submissions in the U.S. and Europe**. I am traveling to Yerevan on Nov 15 …oversee completion of data reporting and analysis. .. I will draft the study report by Dec 15 for inclusion in the CER European submission". (Def. Ex. 136-AM)(Id.)

Critically, in Dumanian's email to Garen, the PI, from August 20th  one day after the August 19th Board Meeting, Dumanian **uses those exact words,** proving that the Dumanians were actively defrauding Schwartz, the Company and its Board re: their A&S activities *before* either of the two funds transfers at issue on August 22nd and September 2nd, *before* Dumanians attempt to fire Schwartz as CEO on August 31st, *before* their Labor Day Weekend 2019 armed takeover of Mesh, and *before* any allegedly extortive call on September 3rd.[58]

Even more inexplicable and unusual is that the Dumanians freely inform and disclose to the Crosson in that same Science Update, that Armenia involves both "prior and upcoming" payoffs, which the Dumanian's spin as "charitable contributions" and also disclosed that Dumanian is planning on authoring the supposedly independent study report himself, notwithstanding that such involvement is strictly prohibited under very the study protocols he drafted, as well as the backdated IEC letter he also drafted.  "Note: Dumanian family has assumed the cost of upcoming travel and of charitable contributions (prior and upcoming)". (Id.) But **none** of this information was included or

---

[58] Notably these dates are either redacted or missing from Pl.Ex.62 - the supposedly 'true and accurate copy" of Randa's work diary, which the court unfortunately relied on previously in issuing its Opinion.

disclosed by Dumanian and Randa in the A&S report they submitted and presented to the Board and

Company employees at Mesh's the August 19th Board meeting.(Id.) Equally concerning is why the

disclosure of this information does not raise a "red-flag" for Crosson.

Critically, even *after* purportedly settling and resolving the dispute by the execution of the

September 5th Special Board Minutes Agreement ("SBMA"), and its key mandate that only qualified

independents would be permitted on the Board, the Dumanian's own internal emails just two days

later, on September 7th proves the Dumanians <u>never had any intention whatsoever of honoring the</u>

<u>settlement</u> (Def. Ex. 136-AL)(Id.) despite their fraudulent representations to the contrary ("*No lying*

*or games. Randa and I are totally complying with the agreement*." (Def. Ex. 77). Instead, as Def.

Ex. 136-AL confirms, it was all just an elaborate rouse - a knowing and deliberate "strategy of

placation" silence, and 'playing the fool" to defraud Schwartz.[59] [60] [61]

Instead, the Dumanians were *still* strategizing and planning to extort Schwartz and the

Company over the Armenia data which they hidden, bad news about the cancellation of Walter Reed

they likewise concealed and fraudulently misrepresented, and planned to force a vote at a 3- person

---

[59] Re: After Sept. 3rd (RD: "<u>**Everything my husband greg did after 9/3 …with respect to mark schwartz was placating him**</u> " (R. Dep. Pg 206:14-18) Re: Sept. 6th (RD: "**Greg was continuing the strategy of placation and pretending that all was back to normal**….") (Id. at Pg 206:14-18); Re: Sept. 9th (Def. Ex. 73)("Q. You say in the first sentence, do you not, that you're <u>**extremely happy**</u>" A. **I was playing the fool. Yes, that's what I wrote**. Q. And you're indicating that you're happy about the settlement agreement being signed and moving on from the dispute, correct? A. **I was playing the fool** (H.231:5-13); Re: Sept. 13th (GD: "**No, I'm smiling and you don't even realize that I'm just placating you** until I know the money is back.")(G. Dep. Pg. 192:9-12) ("I went to Hamburg, and I played the fool." H.110:18-19 (**So, I'm playing the fool. I'm smiling. I'm being with him. I'm having beers with him. And I'm acting like everything is okay** because I don't know where the money is. (H.111:7-9) ("..**I felt .. I could not speak out about the extortion and had to continue to appease Schwartz**.")(D. Dec.(D.60-2¶52))

[60] Q. Are there any e-mails in which you or your family members complain about the location or safety of the funds? A. **No**. Q. Are there any text messages that you exchanged with Randa or Adom expressing any concern about the location or security of the money? A. **No**. (G. Dep. P.166:14–167:23) Q. <u>Isn't it true you never once complained to Mark that you felt you were under duress or being forced to sign anything, correct? Did you ever complain to Mark at that time that you felt like you were under duress?</u> A. Um, when you're in a negotiation, you don't say to the other party, oh, I'm just in such a weak position, you know, please understand that I'm just not doing very well. **That's not the way you present yourself <u>in a negotiation</u>**. (G. Dep. P.164:18-24)

[61] But, critically, the intent to deceive is fraud, *not* duress. Purposeful acts of silence, concealment, "placation", and "playing the fool" are fraud, *not* duress. If one possesses the clarity, presence and purpose of mind to deceive another, that is not the mindless, bereft state of mind necessary to avoid an otherwise valid agreement for duress. Nor is silence. Under Illinois law's objective theory of intent, "secret hopes and wishes count for nothing. The status of a document as a contract depends on what the parties express to each other and to the world, not on what they keep to themselves." *Newkirk v. Vill. of Steger*, 536 F.3d 771 (7th Cir. 2008).

board meeting to approve submission of the Armenia Data to FDA for approval as a suture, by putting a non-independent shill on the Board in clear violation of the SBMA Dumanain had executed and announced only two just days earlier on September 5th.(Def. Ex. 136-AL)(Id.) [62]

To accomplish the latter, the Dumanians needed to install a *non-independent* director to shill for him on the board and *in advance* of the November 4th date set forth in the parties' September 5th SBMA, violating both key provisions of the SBMA which Dumanian signed and announced just two days earlier. To achieve this end, Dumanian chose friendly family relative, Crosson, conspiring with her on October 14th: "My attorney texted your attorney to make sure that things are proceeding." In another email, Dumanian falsely accuses Schwartz of not providing financial statements and misusing funds to push for the quick seating of Crosson, a "true investor" in order to oppose Schwartz on the board and minimalizing any potential value of a "true independent" as required by SBMA.[63] (Id) Critically, Dumanian conceals the "true" reason he needed Crosson seated immediately, to overtake Schwartz's opposition to Armenia per Randa's "Strategy" email (Def. Ex. 136-AL).(Id.)

### IV. The Dumanian's Labor Day Weekend Armed Hostile Takeover and Attack On Corporate Assets and Personnel (Grp_Ex. K - continued),

In response to the reasonable corporate actions undertaken by Schwartz, (Grp_Ex.K), supra, the Dumanians acted upon their long-planned takeover scheme. On 8/31/2019, Dumanian attempted to remove Schwartz as CEO, without the required 90 day notice, and with immediate effect – despite the fact that all Dumanian was personally empowered to do with respect to Schwartz's Employment Agreement was

---

[62] On September 7, 2019, Randa emails Dumanian about a longstanding plan to extort Schwartz using the Armenia data they had sequestered and hidden from him, writing: (**Subject: Strategy: Note to Hector: Our one point of leverage is Human Clinical Data from Armenia... Mr Schwartz Has no access to this data. There is no FDA submission and no FDA approval without this data. Note to Hector: We want the A series filled and a 3-person board meeting BEFORE Thanksgiving (before submission to the FDA). Is this possible?")** (Def. Ex. 136-AL)(Id.)

[63] On October 15th Dumanain writes: "Zabelle being elected to the board is necessary for us ... to **help me stand up to Mark**. She is a big investor, along with her family, so she has skin in the game. I am concerned that there may have been a **fair bit of money diverted**. Andy may want an independent board member - but not at the expense of a **true investor** on the board...but that doesn't change the value of getting Zabelle seated **immediately**")(Def. Ex. 95)(Id.)

25

terminate the Agreement itself – and that is clearly and unambiguously what that Agreement states on its face – thereby financially disincentivizing Schwartz to remain as an unpaid CEO. Dumanian then proceeded to seize Mesh's headquarters without notice or approval from Schwartz or Mesh's Board, of which Schwartz was Chairman.[64] With the help of Joshuel Alomar, the security guard identified in Def. Ex. 6 and Randa's plan to frame Schwartz, Dumanian changed the locks and bribed Mesh's armed security guards, paying them $2,000 in cash, and with specific instructions not to let any of the Schwartzs in the building or on the premises. Schwartz did not learn about this until September 2nd at approximately 7:14 am, after his wife, Yajia, was threatened with a gun by one of the guards Dumanian had hired for that very purpose. At the same time, the Dumanians were also attempting to access Mesh's bank accounts. Given this, Schwartz moved the funds laterally within Wells to an empty account to safeguard them from attack on a banking holiday doing so within less than 5 minutes of learning of an unprecedented attack and threat to corporate assets and personnel, notified stakeholders, and wired funds to his law firms' client trust account the next morning, [65] and clearly noting on each transfer that the express purpose was "safeguard funds", as set forth (Grp_Ex.K)

As their own emails confirm, the Dumanians caused their own economic conditions, in response to decisions and actions taken over Labor Day weekend 2019 and which they planned and plotted in advance (See, "FTS_CALL LIST.docx")(Def.Ex.24). These actions caused Schwartz to act lawfully to safeguard assets and funds and remove the Dumanians from all positions of corporate authority on 9/1 and 9/2 in reaction to an unprecedented attack on corporate assets and personnel. The burden of proof is on the Dumanians to show that Schwartz would have moved funds at 7:20 am on September 2nd anyway. The Dumanians expected Schwartz to attempt

---

[64] Dumanian's scheme and plot to take over the company and extort Schwartz was planned and implemented long in advance of the reasonable and necessary corporate actions Dr. Schwartz was forced to take in response.

[65] Where they were previously wired, deposited, escrowed previously, with each investors' permission and written consent to do so (Grp_Ex.L), *including the Dumanians,* and notwithstanding Dumanian's perjured sworn testimony portending otherwise: "Schwartz had no attorney-client relationship with Mesh Suture that would have ever permitted him to wire $4 million to his law firm's client trust account." (Dum. Dec. 60-2, ¶36)

to stop them, so they made plans in advance to prevent him. Schwartz took reasonable steps to safeguard funds as a director, shareholder, and account signatory. Schwartz had a fiduciary obligation to do so, even if he was purportedly fired as CEO. Schwartz's actions were entirely lawful and proper. He notified stakeholders in real-time, never commingled, spent, or personally benefitted from holding and safeguarding the funds. Schwartz couldn't anticipate the Dumanians' junta over Labor Day weekend 2019 or Dumanian's notice of a special board meeting at 8:00pm on 9/2. However, these actions prompted the immediate need for Schwartz to safeguard funds which were under attack that morning and remove the Dumanians from all corporate authority that evening at the meeting Dumanian called. Dumanian's actions, including freezing and co-opting corporate assets and funds to "F-the Schwartz's" and pursue their personal illicit research & regulatory agenda which they had long concealed, breaching the agreements, refusing to cooperate, and strategy of "placation" and playing the "playing the fool" were all part of the Dumanians' concealed plan and plot to take over control of Mesh since at least March 2019, not Schwartz's. Nor is there any causal connection between the 2019 founders dispute and settlement agreements and the opening of the Wells account in 2017, which predated both by over two years.

As alleged in Defendants' Counterclaims, (D. 70, ¶¶118- 133) "On August 3, 2017, Schwartz specifically advised Wells Fargo bankers, Johnny Navarro, and Branch Manager, Mohsin Sayyad, that he had a co-owner in both companies, Dumanian, who lived out of state. They advised that was not a problem and that the account could be opened without Dumanian being present. However, a computer generated application they prepared incorrectly listed Schwartz as the sole owner of the companies, which was contrary to Schwartz's verbal representations and the corporate paperwork he submitted. Unbeknownst to Schwartz, Wells Fargo had a fraudulent account sales scheme in place that incentivized bankers to disregard proper

documentation to increase accounts, violating a 2015 Consent Order with the US Comptroller of Currency to "cease and desist" from its fraudulent sales and account documentation practices and, in 2020, after violating the Consent Order, Wells plead guilty to the scheme, paid $3B in fines, and its former CEO was banned from banking for life.

Such a misrepresentation about beneficial corporate ownership, even if it was made, was in no way causally related to the Dumanain's duress. Critically, beneficial ownership interest in the company being a listed owner of a company on account documentation, alone, would not, nor could not empower or enable a wire/transfer – for that, you need to be a signer on the account. Signatory authority, not beneficial ownership interest in the company - is required to make/send wires/transfers. By way of example, if you own stock in Microsoft stock, does that give you any ability to wire funds from Microsoft's bank accounts? No, of course not, it is signatory authority which does that. The bank's own internal KYC documentation as to beneficial ownership has no bearing on whether those beneficial owners have account access or transfer/wire funds. And at all times, Schwartz possessed signatory authority, which Dumanian signed corporate banking resolutions to approve. Where is the causal connection? Any failure to note Dumanian's ownership interest in Mesh was attributable to Wells, not Schwartz. And critically, Dumanian and Randa had corporate banking resolutions in their possession since April 18, 2018 which they could have used to access the account or become signatories – but they never did. Dumanian was aware he had to visit a branch in person to become a signatory. He even tried adding himself to the account as a signatory in 2018 – claiming is was one of his "goals for the trip", "but never followed up on that." (DUM: "Q. Did you ever attempt to gain access to this account in Edwards, Colorado, or in the Eagle County area? A. Yes. It was in early 2018. One of the goals of the trip was for me to sign these documents. Together we walked into the -- the Eagle

branch bank of Wells Fargo, and all of a sudden we had barely gotten in and we turned around and he said, oh, the guy we need to see isn't there today, and then we left…And we never followed up on that.")(H.41:13-42)(SWZ: "At Wells they weren't signatories. … They could have been at any time, but they never -- did the legwork.")H.332:24-333:2)

Nor could Schwartz be culpable or complicit in Wells' admitted fraudulent/lax account documentation scheme after personally supplying Wells Fargo with corporation documents all bearing Dumanian's name, signature, and evidencing his 50% beneficial ownership interest in the companies, which Dumanian admits, Wells had on file in its records. How could Schwartz be responsible for a computer-generated, typewritten entry by a Wells employee not by Schwartz, not handwritten or in any way signed or attested to by Schwartz, and no evidence he even saw what they had entered. Moreover, there is no intent to defraud – if Schwartz intent in opening the account as sole owner of Mesh, why present resolutions, the founders agreement, and other corporate documents bearing the Dumanian signature and evidence of a 50% ownership interest in the entity ? And If Schwartz intended to prevent Dumanain/Randa from becoming an additional signatory on the account, why would Schwartz draft and execute corporate banking resolutions which authorized them as additional signatories? Further, how could Schwartz in August of 2017 foresee the Dumanian's takeover over Labor Day weekend in 2019. How was that reasonably foreseeable in August 2017, two years earlier? How could Schwartz foresee that Dumanian would later renege on the 324k loan and later try to extort him over it at the August 19, 2019 Board Meeting in 2019, attempt to unilaterally disable his email and online access to the wells account on August 22, 2019, stage a corporate takeover of the building and bank accounts over Labor Day Weekend (8/31/2019-9/2/2019), and then criminally slander his title and authority over the account using fraudulent corporate banking resolutions he prepared on 8/31 and 9/2 and threaten wells with

being an accomplice to a crime Dumanian was anticipating Schwartz would commit to use as leverage against him on 9/3/2019, the day after Schwartz informed over 170 stakeholders that he was already "holding and safeguarding" assets?

## VI. Dumanian's Perjury Regarding The Special Board Meeting He Noticed And Convened For 8pm Est On September 2, 2019 (Grp. Ex. L)

At 8:00pm EST on 9/2/19, Dumanian convened a special board meeting, which Dumanian gave Schwartz notice of on 8/31/2019 and which Schwartz duly accepted on 9/1/2019 and advising that he would participate in electronically, in writing, not over the phone. At the meeting, Schwartz provided signed and ratified Board Resolutions and Notice to stakeholders of official board action being taken in response to the Dumanians' ultra-vires acts upon corporate assets and company personnel, attempted extortion of him, and other criminal breaches of corporate and fiduciary duties. Those signed Board Resolutions terminated the Dumanians and removed Dumanain from the board for cause, with Schwartz remaining appointed as interim Series A representative until an official vote could be held, which Schwartz's Notice specified would be held 60 days later. Schwartz's Notice also communicated the reason for Dumanian's removal and that he was holding and safeguarding corporate assets due to the Dumanain's attack upon them.

The board's removal of Dumanain was ratified by signed corporate minutes signed by two of the three members board Members at that time. Schwartz didn't need Dumanain to sign them for the resolution to carry without him, and there would be no reason for Schwartz to try to bully/intimidate Dumanian to obtain his signature on the September 2, Special Board Meeting Minutes, when it wasn't needed. Dumanian commits perjury about this as well: Stating, 'on September 2, 2019, Schwartz attempted to bully me into signing purported board minutes of a "Special Emergency Meeting of Directors of Mesh Suture Inc.." (D. Dec. D.60-2,¶27) – when Schwartz did no such thing.

Schwartz's clear intention by that communication was to notify stakeholders of the circumstances necessitating Dumanain's removal, not to assume control. Critically, Schwartz's September 2nd Notice and signed Board Meeting Minutes at the Special Meeting Dumanain convened, removed Dumanain from all involvement with Mesh Suture, did so for cause and with immediate effect, and made no reciprocal demands whatsoever upon Dumanian. Dumanian's removal was fully effectuated and complete upon electronic transmission of signed corporate resolutions. Causally, Schwartz could not have reasonably anticipated either Dumanian's notice of a board meeting on September 2nd or the Dumanians' armed hostile takeover earlier that same weekend.

Two mutually negotiated settlements followed which were signed by the Dumanians with assistance of two sets of counsel and without any reservation of rights. Critically, Schwartz did not need to settle with Dumanian, and thus, Schwartz had neither reason nor motive to compel the execution of agreements he did not need. Schwartz even stated as much to Dumanian by written correspondence September 8th (Def_Ex. 64)[66] As sch there absolutely no truth in Dumanians false "belief that because I refused to sign Schwartz's September 2, 2019, proposed board resolutions,

---

[66] "Greg –I feel both my and the Company's actions are on extremely strong ground here. So, in the nicest possible way, I believe this agreement is actually necessary to protect you, at this time, not me or the company. Some of the language you inserted or deleted is acceptable and I attach a redline to see what I am willing to accept, but the rest of it isn't appropriate given where we are now, and how we got here. So…. We can either get this done. Or not. It's up to you. Without this agreement signed, the Company will not be paying for any of the damages and expenses that have been occasioned by your and Randa's recent actions. Lawsuits will likely follow from that. And I'm serious about that, which is why you need to cooperate 100% and need to sign the agreement indicating that you will. The damages are mounting daily, and I am left holding the proverbial bag trying to clean this up as soon as possible and I need your 100% cooperation and help to do it. You have real exposure here, and I really am trying to help you. This really isn't the time for another Dumanian control exercise. I attach the second version in clean copy and redline against the original draft. Please execute this evening so we can move on from here. The Company and I are only willing to entertain a zero-damage settlement for a short while longer. The settlement agreement I sent you is standard, and extremely comprehensive in its releases, and contains no hidden "tricks", "costs" or "barbs". It releases everything from all time so we can move forward and begin again from here and never have to look back. Same for the employment agreements. Please sign everything this evening and let's put this behind us and move forward together. You really owe a show of some good faith here at this point. I am really trying very hard to help you clean your mess up here, not mine. Please help. No need to speak. I don't want to even argue a single addition you made which is all Dumanian-focused, not mutual and in the spirit of moving on. So please just send the attached signed agreement over so I can send it to the D&O carrier tomorrow am before I leave, or not. …. I would rather notify them and tell them it is resolved, rather than not. Without the settlement agreement, it's not resolved. Please do the right thing for the Company and yourself. Thanks Greg."

he conjured up. and acted on. an extortion scheme to steal the approximately $4 million of the Company's money in the Account in order to extort Plaintiffs' signatures on his proposed board resolutions and a subsequent settlement agreement." (D. Dec. D.60-2,¶28) Again, Schwartz didn't need to settle with Dumanian.

But for the Dumanian's armed assault upon company assets and personnel over Labor Day weekend 2019, Schwartz could not have anticipated negotiating a settlement agreement which permitted Dumanian to remain involved in company and the board. Nor were Schwartz or any of the other Defendants aware of the Dumanians' concealed personal hatred of them, aware of their hidden research and regulatory agenda, or that Dumanian had attempted to freeze Mesh's account at Wells on September 3, 2019, and that his request remained active and pending, and was never disclosed or withdrawn by him, notwithstanding Dumanian's his execution of both settlement agreements.  Further, Schwartz's September 2nd Notice makes it clear that he believed the company would be far better off without Dumanian's involvement. Still, it was in every ones' interest to resolve the dispute.  Schwartz and the other Defendants had no reason to expect the Dumanians would not honor the agreements.

Schwartz nonetheless offered a settlement of zero dollars to the Dumanians fully releasing them for their past transgressions that allowed Dumanian to return to the board and continue his and Randa's involvement in the company at the same compensation as Schwartz and his wife. The only requirement was that the Dumanians cooperate in good faith and an agreement that in order to assure good governance, shared stewardship, and a lasting peace, they would only install qualified independents members to the board going forward.

Critically, Schwartz did not need to settle anything with Dumanain, so why would there be any motive to extort one.  As communicated in Schwartz's September 2nd Notice to stakeholders,

the Dumanians had terminated and Dumanain been removed permanently removed from Mesh's board for cause, and Schwartz felt that the company would be better off without him due to his conflicts of interest. Schwartz was not required to settle with Dumanain. Nor did Schwartz have as be as magnanimous and lenient as the agreements were on the Dumanians in these Agreements, Still, it was important to resolve the dispute and was in everyone's interest to do so.

Schwartz trusted Dumanain and believed the Dumanians would honor the settlement. Meanwhile, Schwartz had no idea they were *still* trying to take over Mesh, its $4M at Wells Fargo, defaming him to investors, scheming to install a "true investor" to shill for him on the board after resolving in the SBMA not to. Nor could Schwartz have known that they would commit perjury and try to frame him to avoid honoring the settlement.

## VII. Dumanian's Perjury & False Testimony Re: The September 3rd Call and Plan B: (Grp._Ex.M)

Dumanian has provided perjured testimony about supposed threats made against him by Dr. Schwartz. Dumanian swears under oath that Schwartz threatened his money and refused to return it, was holding the money hostage, that Schwartz resorted to extortion, amongst other supposed transgressions that took place during a seminal telephone call on September 3, 2019. Dr. Schwartz is presently facing criminal jeopardy over these self-same perjured allegations The Dumanians' entire case is predicated on events Dumanian claims occurred on that call to overcome the finality of the parties' settlement documents and has proffered sworn testimony to support the veracity of those clams. However, the evidence shows that Dumanian has conjured up his duress case from thin air and has criminally misrepresented the true nature of the September 3rd, 2019 call.

Dumanian has thoroughly perjured himself in these proceedings to frame his longtime friend, patient, and business partner. Justice demands that Court undertake a thorough review of the irrefutable objective record evidence, and critically, both the recording and verbatim transcript of

the seminal call on September 3, 2019 itself, and compare that 23 minute recording and transcript against the thoroughly false criminal claims Dumanian makes in that Complaint (D.1, 16) filed only five weeks later, and then furthers with a thoroughly perjured Sworn Declaration (D.60-2) in June 2020. Critically, if there is no evidence of any threats or extortion on that call, as Dumanian has sworn under oath and penalty of perjury throughout these proceedings that there was, **this case is over**, leaving this Court to decide only how to stop the fraudulent criminal charade and sham presently before it, rectify its past decisions predicated on that fraud, and provide the other appropriate relief as sought herein.

The Recording and Transcript (Exs. I, II) of that seminal September 3, 2019, call is unassailable objective evidence proving that Dumanian has committed a sentient and malicious fraud upon this Court since the inception of this case. Dumanian's fabricated version of events is so utterly discredited by the record that no reasonable jury could believe him. See, *Scott v. Harris*, 550 U.S. 372 (2007). The truth is simple but not as falsely testified to under oath and penalty of perjury by Dumanian. Here, the objective Recording and Transcript of conclusively proves that each of the accusations Dumanian makes in his Sworn Declaration proffered in response to Defendants first Motion for Summary Judgment (D.47) is incontrovertibly false, (Dum Dec. D.60-2) as the Recording and Transcript prove that **absolutely none of the following** occurred on the call:

- "Schwartz started "extorting" me and my family on September 3, 2019." (¶ 28, 35, 38, 39, 42-43, 50-51)
- "On September 3, 2019, after Schwartz drained the Account, he told me over the phone, "I have your money" (¶ 37).
- "On September 3, 2019.Schwartz threatened me that his "Plan B" was to not return the money unless I agreed" (¶37)
- "Schwartz told me over the phone September 3, 2019 "I have your money," and threatened me that his "Plan B" was to not return the money unless I agreed that (i)he would be reappointed as CEO;(ii) the Board would be reconfigured to give Schwartz complete control over it; and (iii)Mesh Suture would loan Schwartz over $300,000." (¶ 37)
- "On the September 3, 2019, phone call... Schwartz was refusing to accept his termination of employment. (¶ 38)
- "On the September 3, 2019 phone call. . Schwartz .. resorted to extortion." (¶38)
- "On the September 3, 2019, phone call ... I clearly stated to Schwartz that he needed to immediately return the money to the Account, and Schwartz refused." (¶ 38)
- Litigation was not discussed on the September 3, 2019, call, and any suggestion … that "Plan B" was to "litigate" is not what occurred during that call. "Plan B" was Schwartz stealing the money to secure his job and position. Schwartz said to me, "I have your money" and made various demands on me and my family, while making clear he was holding the money hostage." (¶ 39).
- "Schwartz … made clear to me that he was extorting my family's and my signatures on the …Agreements." (¶ 42)

- Schwartz made "direct threats" (Id. at ¶ 39, 45-46).
- "Schwartz's direct threats caused me and the other Plaintiffs tremendous fear." (¶ 45);
- Schwartz made "direct threats that he would disappear with all the investment dollars if the Dumanians did not acquiesce to his demands" (¶ 46).
- Schwartz conjured up and acted upon an extortion scheme to steal the approximately $4 million … in order to extort Plaintiffs' signatures on his proposed board resolutions and subsequent settlement agreement." (¶ 28)

Rather, it was Dumanian who threatened Schwartz, "just bring everything down" and see Schwartz "go to jail".[67]   Schwartz acted as peace maker on the call, *never once* threatening Dumanian. At trial, Dumanian admitted to threatening Schwartz.[68]

The Recording and Transcript prove that Dumanian is lying.  Schwartz did not extort Dumanian, threaten to disappear with funds, or tell Dumanian his Plan B was "taking the money. Schwartz never once mentioned the loan, termination, or reappointment. Critically, Schwartz acted to de-escalate tensions, convincing Dumanian to meet with him meet for third-party mediation in Las Vegas on September 6, 2019.

Dumanian also committed perjury regarding "Plan B" at the hearing, testifying Schwartz's "Plan B" was "taking the money"[69] and deceiving the Court to such an overwhelmingly prejudicial extent that the Court was defrauded into relying Dumanians' perjured testimony about "Plan B" [5] over Schwartz's own words on the recorded call itself, which it did not listen to out of apprehension, but irrefutably proves otherwise.  [70]  Instead,  the Court found that Schwartz's Plan B was to "take

---

[67] "I can fight a long time. And um, I'm a stubborn man. And I'll, **I'll just bring everything down**. Is that what you want?... Well, um, you'll be foreclosed, and or **go to jail**, and um we won't have a company, so there … that's a good starting point." (Emphasis added)(Transcript, Ex. II, p. 1, ¶ 27, p. 2, ¶ 7; Recording, Ex. I, 00:20.)

[68] Q. During that call, didn't you threaten Mr. Schwartz that you would, quote, just bring everything down, unquote? A. Yes. **Q. Weren't you the one threatening Mr. Schwartz and not vice versa?** A. He's the one that took the 4 million. But, **Yes, I was threatening him on this phone call**, maybe in a misguided effort that that would bring him and get him to put the money back. (H.204:4-205:3)

[69] Q. Isn't it a fact that Mr. Schwartz never threatened you in any way during that call? A. **He was talking about Plan B, and Plan B was taking the money.** So, yes, he was threatening. **He said Plan B is already under way. So, that was the threat**. (H.204:4-205:3)

[70] GD: I can fight a long time. And um, I'm a stubborn man. And I'll, I'll just bring everything down. Is that what you want? Well, um, you'll be foreclosed, and or go to jail, and um we won't have a company, so there … that's a good

the money" to extort Dumanian, when the Recording, Transcript, and record evidence proves otherwise – that Schwartz wanted to achieve a "lasting peace" through mediation and mutual compromise "to fix this" for the benefit of all stakeholders because the only other option, "Plan B", which involved "lawyering up" and "filing suits" was a "bad idea." The Court also ignored record evidence wherein Schwartz had communicated the <u>exact same</u> message - that <u>Plan B was litigation</u> - in his September 1st email to Dumanian, his September 2nd Notice to stakeholders, and then again in his September 21st email about the account freeze to Dumanian, after funds were already back in Mesh's account Wells. Thus, there was absolutely no factual basis for the Court's finding other than relying on Dumanian's perjured testimony, that Schwartz's plan B was "taking the money" or "holding it hostage". It was litigation - "lawyering up" and "filing lawsuits" - which hadn't happened, and was thus still not too late to avoid, exactly as Schwartz explained to Dumanian on September 21, 2019, ("*It is not too late for you to turn this around. Plan B makes no sense. But we will be there very shortly, unless you act responsibly, immediately. All Wells Fargo needs to unfreeze the account is a simple letter from the Dumanians or your counsel*" (Def. Ex. 87). Dumanian refused. But why?

Critically, as stated supra, it was because **"taking the money" on September 3rd at Wells** was the Dumanians' Plan– *not* Schwartz's – but Dumanian commits perjury to conceal, and frame

---

starting point. MS: I don't think Plan B looks good for either of us. (Tr,1:27-2:6) "Plan B is a lot worse than you think. And I've been through Plan B, okay? I know Plan B looks like. I don't really think that you do. And so let's stay out of that and stay creative. I would like to fix this." (Tr,5:25-27) "I think at this point we are at war and I want to try to come to a lasting peace. Alright? that's why I'm taking the call. Alright? Cause I know, I know what comes next." "I think that we need to go through some sort of mediation because I don't really think you really understand that we're already in Plan B. And I'm not willing to back to the status quo with you. I can see that there's no lasting peace there. So, I'm glad you reached out. I'm willing to fly to Chicago, come there, do a mediation with you. Try to, you know put things back on track instead of focusing on the day-to-day affairs, we're focused on this. Fighting each other. It's a war. It's a war in the Middle East." (Tr,6:12-8:22) "But Greg, **we only have 2 options here**. There's only **Plan A** where we come up with a solution that works not just for today but going forward. That's a mechanism for success. That's what I'd like to try and do because I think that's the only thing that benefits all of us and all of the stakeholders." (Tr,14:10-13) "And so, **Plan B**, as I've said, everybody's starts **lawyering up**. We start **filing suits**, all that. **I think that's a bad idea**. (Tr,8:4-5)

Schwartz for a plan that was his, not Schwartzs' all along. [71]

Schwartz's fear of crime caused him to record the call.[72] And thank God he did, or he would have no chance of correcting the fraud and injustice the Dumanians have foisted upon him.

Critically, Dumanian falsely testified at trial that "he was under severe duress at the time that both agreements were signed" due to "The knowledge that Mr. Schwartz had taken $4 million out of the company bank account and my fear that it was in Hong Kong where it would be unaccessible or inaccessible for legal remedies:" (H.190:23-191:6), and that this fear was the reason he had no choice or reasonable alternative other than to execute both agreements because "I was despondent about the Series A investor money being at China, at HSBC Bank. And I knew it had to come back.(101:20-22)" "I knew it was a horrible, horrible thing that was happening to me and my family, but I had no choice" (102:7-9) He also falsely testified at the hearing that the reason and purpose for his call to Schwartz on September 3rd was to specifically to talk to Schwartz about all of this, claiming: "Well, all of the money of the funds, the funds of the company had been pulled away, and he had done it, and I needed to talk to him about it" (H.145:8-14). Critically, however as proven by both the Recording and Transcript, Dumanian **never does.**

In fact, Dumanian remains objectively silent regarding his claimed duress on the call, mentioning absolutely nothing about his supposed fear that the money might be at HSBC, nothing about the transfer at Wells Fargo, nothing about Mesh's $4M, and nothing about where Schwartz was holding and safeguarding funds as Schwartz communicated his September 2 Notice the

---

[71] Which the Dumanians plotted in advance to do After their "Plan A", to extort board and shareholder control away from Schwartz over $324,000 loan failed, on both August 19th and August 22nd. See ("Vulnerabilities", Logins and passwords, Wells Fargo, Meshsuture email")(Def. Ex. 15), ("FTS_board resolution for opening accounts")(Def. Ex. 21), and "FTS_CALL LIST.docx" re: both Wells Fargo and HSBC (Def. Ex. 24)

[72] Schwartz testified he recorded the call because "**I was in fear of what his purpose on the call was. He had just committed a crime against my wife and against the company and its investors**. I didn't know what he was planning on calling me about, **and I felt I was getting set up for something**. I didn't know how he would use the call. And I thought he might record it. So, I figured I'd better do the same. (H. 342:8-343:5)

evening before - **Nothing.**[73]

So besides committing perjury re: Schwartz's supposed threats to disappear and extortion on the call, Dumanian also commits perjury regarding discussing, mentioning, or even asking Schwartz about any of this on the call, after falsely testifying that the reason he called Schwartz was specifically "to talk to him about it". Does this make sense? Wouldn't the quickest and easiest reasonable alternative to signing documents have been to **just ask?** So why doesn't he?

Dumanian answers a part of this question, when he admits, "I wanted him to put the money back. <u>But I knew.. that somehow I was responsible for him having taken the money</u> and <u>I needed him to put it back</u>. (H.96:15-25)[74] Critically, Dumanian had already been to a Wells Fargo branch earlier that day as part of their premeditated plan to do so on August 31st, that Dumanian carried out to completion in the morning of September 3rd, just as planned [75] Critically, the Dumanians were planning to do so in any event, three days before Schwartz transferred funds to safeguard them from the Dumanians' attach. Dumanian did need Schwartz to "put the money back" at Wells, otherwise the Dumanian's criminal scheme to freeze the account armed with a fraudulent bank resolution, claiming to be Board Chairman after being removed from the Board the evening before, using Schwartz's stolen corporate seal and criminally defaming Schwartz to Wells and threatening the Wells would be "an accomplice to this crime unless it accedes to Dumanian's demand to freeze the account, would all be for naught. This was also the reason that none of the Dumanian ever contacted

---

[73] Randa Dumanian was already in communication with HSBC regarding Mesh's Hong Kong account on September 1st **where she was a company director and an account signatory, so any resulting "fear" that Dumanian falsely testified about re HSBC and the funds there being inaccessible there is neither true, nor reasonable either**.

[74] This admission cuts any causal nexus between Schwartz's precautionary transfer to safeguard funds from the Dumanians takeover and any resulting "duress" he may have experienced.

[75] See ("Vulnerabilities", Logins and passwords, Wells Fargo, Meshsuture email")(Def. Ex. 15), ("FTS_board resolution for opening accounts")(Def. Ex. 21), and "FTS_CALL LIST.docx" for Wells Fargo and HSBC, where Randa Dumanian was already a signatory on the Account (Def. Ex. 24)

the authorities over Schwartz's precautionary funds transfer – because they were the ones engaged in criminality, extortion, bank fraud, research fraud, and theft of corporate assets on September 3, 2019, not Schwartz.

## VIII.   Dumanian's Perjury Re: The Reasonable Alternative of Mediation

Dumanian also thoroughly perjures himself regarding the reasonable alternative of Mediation, which he flatly denies occurred on the call, despite the fact that Dumanain and Schwartz spent the majority of the call discussing and planning it, falsely claiming in his Sworn Declaration that:  "**There was no discussion of a formal mediation during the September 3, 2019, phone call**"  (D.60-2 ¶40) Why?  Because Dumanian had already agreed to meet Schwartz for formal mediation on Friday, September 6, 2019 in Las Vegas.  Isn't that exactly what Mediation is for – to resolve disputes – so attending formal mediation following day with Schwartz would clearly would have been a reasonable alternative to signing the September 5th SBMA, especially when Dumanian had already agreed to do so during the September 3rd call with Schwartz.

## IX.   Dumanian's Perjury Re: Schwartz's Status As Board Chairman (Grp. Ex. C)

Dumanian also commits perjury *18 times* regarding denying that Schwartz was Board Chairman during the entirety of 2019 (Dum. Dec. D.60-2 ¶ 3) despite admitting on the call, GD: **Mark, you are Chairman of the Board. You could have called a meeting anytime you wanted**, as confirmed by both the Recording and Transcript (See Transcript., p13. ¶ 26)(Recording, 22:17) In addition, the objective record evidence in the Dumanians' own internal email communications in their own words - confirms exactly the same thing – that both Randa and Dumanian were both aware and agreed that Schwartz was Chairman of Mesh's Board during the entirety of 2019.  (See Grp Ex. C): Nevertheless, despite the truth that  **Schwartz was Chairman of Mesh Suture's Board** in 2019, Dumanian perjured himself on this issue on five separate occasions during the

hearing alone (H.179:4-23, 181:18-182-5, 185:16-19, 186:2-25, 187:10-14), and Randa also perjures herself on this issue at the hearing (H.584:17-25, 590:11-14), as set forth and enumerated in (Grp. Ex. C) Dumanain also perjures himself in his sworn declaration on this issue as well. (Dum Dec. 60-2 ¶3, 51)

Why is this being Board Chairman critical and material to Dumanian's case? Per Dumanian, being chairman of the board in 2019 entitled him to be "above the Board" and CEO, able to take unilateral, personal, and ultra vires corporate action without a board meeting or vote any time he wished, which including taking over the company, firing the CEO so without notice and with immediate effect, seize control of corporate assets, including seals, facilities, IT, IP, bank accounts, take over Mesh's HQ, close its facilities and block employees from entering without notice, change locks, appoint his wife as CEO, seize personal property inside its premises, call the police on employees who had the right to enter, and prevent Schwartz, while still CEO from transferring funds or accessing corporate accounts without his personal permission, so he commits perjury to give himself this title to try to exculpate himself and Rands from the illicit ultra vires actions they took during their armed hostile takeover of Mesh during labor day weekend in 2019 to self-justify and try to exculpate themselves from liability for having done so, when it was in fact Schwartz who was Board Chairman during the entirety of 2019.

<u>CONCLUSION</u>

There is no escape from the plain truth that Dumanian knew from the inception of this case, just weeks after that call, that his duress claims and criminal allegations against Schwartz were false and which he continued to bolster, advance and further through perjury. Dumanian's perjury at trial and in his sworn Declaration to criminally frame Schwartz for fraud, extortion, and theft to cover up and obfuscate his own form the very cornerstone of his duress claims and constitute a

fraud upon the Court, calculated to interfere with the justice system's ability to impartially adjudicate this matter by improperly influencing it and unfairly prejudicing the presentation of Defendants affirmative claims and defenses. *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1117 (1st Cir. 1989)("It strikes us as elementary that a federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing a fraud on the court"). The Court has the ability to dismiss Plaintiffs' claims, with prejudice, due to Dumanian's pernicious conduct in filing and pursuing claims which were knowingly false when filed. "'[P]erjury strikes at the heart of the integrity of the judicial system ... '" *United States v. Stokes*, 211 F.3d 1039, 1046 (7th Cir. 2000). It "undermines the function and province of the law and threatens the integrity of judgments." *United States v. Alvarez*, 567 U.S. 709, 132 S. Ct. 2537, 2540 (2012). It "poisons the life blood of the administration of justice." United States v. DiStefano, 464 F.2d 845, 854 (2nd Cir.1972). "No fraud is more odious than an attempt to subvert the administration of justice." *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 251,64 S. Ct. 997, 88 L. Ed. 1250 (1944). Because of its seriousness and pernicious consequences, perjury may warrant the drastic sanction of dismissal. *Jackson v. Murphy*, 468 Fed. App'x 616 (7th Cir. 2012); *Allen v. Chicago Transit Authority*, 317 F.3d 696 (7th Cir. 2003)(a litigant who defrauds the court should not be permitted to continue to press his case). A court must be mindful of its responsibility "'to deter future parties from trampling upon the integrity of the court.'" *Jackson,* at 620.

Here, Dumanian's perjury at trial and deviations from the truth in his sworn Declaration (D. 60-2) are so pervasive, so extensive, so glaring, so malicious and so carefully interwoven and crafted to advance every critical and material element of false claims and claim and frame Dr. Schwartz, that it cannot be concluded that Dumanian acted in good faith, that his testimony can be

attributed to innocent misrepresentations or forgetfulness or that they relate to de minimis or overestimated matters on the periphery of this case. Rather, it constitutes the case itself.

Dumanian makes similarly perjured allegations in another case pending in N.D.Ill. Case 1:20-cv01800, at (D.7-3). Dumanian's false allegations, which he has pursued since the October 19th, 2019, filing of case – only weeks after the call, are the very heart of the matter. Nor is Dumanian's perjury borne from mere "confusion, mistake, or faulty memory." *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012). Having trampled on the integrity of this Court, the Dumanians should not be permitted to continue to press any aspect of their case. Courts have consistently found that the sanction of dismissal is appropriate when misconduct directly impacts the core allegations of the complaint and prevents the defendant from presenting a defense, as has clearly occurred here. *Aoude*, 892 F.2d at 1118; Jackson, at 620.

The Seventh Circuit has held, "that a dismissal with prejudice is an appropriate sanction for lying to the court... because no one needs to be warned not to lie to the judiciary." *Ayoubi v. Dart*, 640 Fed. App'x 524, 528-529 (7th Cir. 2016).See also Negrete v. Natl'l R.R. Passenger Corp., 547 F.3d 721, 724 (7th Cir. 2008)("**although Negrete may not be well educated, it does not take a graduate degree to understand that it is unacceptable to hide evidence and lie**"). Here, in this case, we have the polar opposite situation as in Negrete, highly educated people, and the danger to our justice system is worse when people of such incredibly high intelligence can so sentiently and maliciously perjure themselves to deceive the trier of fact. Since docketing this case in October 2019, Dumanian has made good on his earlier threats against both Schwartz and Mesh. No one, including Dumanian, should be above the law.

And that, of course, is the danger when people with ivy league educations and such impressive professional backgrounds conspire to deceive the judiciary. Here, even with an

irrefutable evidence of an objective recording, Dumanian is presently succeeding on his threat of seeing Schwartz go to jail predicated on the self-same perjured claims as pending here. Unless this Court acts immediately, there is little doubt that a manifest injustice will occur, and is already occurring.. He also has filed a baseless motion for summary judgment,[76] where nearly every allegation of claimed "uncontroverted facts", are false, and should not be permitted to survive the relief called for herein to shut down the criminal sham and charade in this matter.


Dated: February 22, 2023


                                        Respectfully Submitted,

                                        By: /s/ Mark A. Schwartz, Esq.

Mark A. Schwartz, Esq
Law Office of Mark A. Schwartz, Esq.
110 Dorado Beach East
Dorado, Puerto Rico, 00646
maschwartz@tllgrp.com
312-810-2220

## CERTIFICATE OF SERVICE

I, Mark A. Schwartz, hereby certify that I caused a true and correct copy of this pleading to be served upon all counsel of record via CM/ECF on February 22, 2023.


                                        /s/ Mark A. Schwartz, Esq.

---

[76] that motion, should not be allowed proceed, in any event as it is wildly premature given the evidence produced in the criminal case which the undersigned has yet to review consisting of seven volumes, including statements, and grand jury testimony by the Dumanians. Additionally, Discover was never closed in this matter, and the relief requested in Defendants earlier Motions to compel answers to discovery and requests to admit should be granted. Plaintiffs work diaries are also required, and Defendants should be given an opportunity to depose Plaintiffs on their case, which they have never been given, for all the reasons and justification given in Defendants' Motion for Reconsideration.